# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:19-cv-00250-MR-WCM

| | |
|---|---|
| MARCUS HYATT and ASHLEY BARRETT,<br><br>          Plaintiffs,<br><br>    vs.<br><br>QUENTIN MILLER, in his official capacity as Buncombe County Sheriff; WESTERN SURETY COMPANY; J.D. LAMBERT, individually and officially; JEFF MAY, individually and officially; and KATHERINE LEWIS, individually and officially,<br><br>          Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    <u>MEMORANDUM OF</u><br>   <u>DECISION AND ORDER</u> |

**THIS MATTER** is before the Court on Plaintiff Hyatt's Motion for Partial Summary Judgment [Doc. 66]; Defendant Miller and Western Surety Company's Motion for Judgment on the Pleadings [Doc. 74]; Defendant Miller and Western Surety Company's Motion for Summary Judgment [Doc. 75]; and Defendants Lambert, May, and Lewis's Motion for Summary Judgment [Doc. 78].

# I.    PROCEDURAL BACKGROUND

On August 27, 2019, Marcus Hyatt and Ashley Barrett (the "Plaintiffs") filed this action asserting claims related to searches and seizures that occurred following two separate traffic stops on January 20, 2018. [Doc. 1]. Thereafter, the Plaintiffs filed a First Amended Complaint and a Second Amended Complaint. [Docs. 14, 40].

On September 25, 2020, the Plaintiffs filed a Third Amended Complaint against Buncombe County Sheriff Quentin Miller; the Buncombe County Sheriff's surety, Western Surety Company; and Buncombe County Sherriff's Deputies J.D. Lambert, Jeff May, and Katherine Lewis. [Doc. 63]. In the Third Amended Complaint: (1) Plaintiff Hyatt asserts false imprisonment and false arrest claims against Defendants Lambert, May, and Lewis (the "Deputy Defendants") in their individual and official capacities; (2) Plaintiff Hyatt asserts assault and battery claims against the Deputy Defendants in their individual and official capacities; (3) Plaintiff Hyatt asserts a claim under 42 U.S.C. § 1983 for unreasonable sexually invasive search in violation of the Fourth Amendment against Defendants May and Lambert in their individual capacities; (4) Plaintiff Hyatt asserts a claim under 42 U.S.C. § 1983 for unlawful seizure in violation of the Fourth Amendment against the Deputy Defendants in their individual capacities; (5) Plaintiff Hyatt asserts a

2

claim for unlawful search in violation of the Fourth Amendment against the Deputy Defendants in their individual capacities; (6) Plaintiff Barrett asserts false imprisonment and false arrest claims against Defendants Lambert and Lewis in their individual and official capacities; (7) Plaintiff Barrett asserts trespass to property claims against Defendants Lambert and Lewis in their individual and official capacities; (8) Plaintiff Barrett asserts a claim under 42 U.S.C. § 1983 for unlawful seizure in violation of the Fourth Amendment against Defendants Lambert and Lewis in their individual capacities; (9) Plaintiff Barrett asserts a claim for unlawful search in violation of the Fourth Amendment against Defendants Lambert and Lewis in their individual capacities; and (10) Plaintiffs Hyatt and Barrett assert a claim for action under the bond against Defendant Miller and Defendant Western Surety Company. [Id. at ¶¶ 42-118].

On October 9, 2020, the Deputy Defendants filed an Answer to the Third Amended Complaint. [Doc. 69]. On the same date, Plaintiff Hyatt filed a Motion for Partial Summary Judgment on the claims against Defendant Lambert. [Doc. 66].

On October 13, 2020, Defendant Miller and Defendant Western Surety Company filed an Answer to the Third Amended Complaint. [Doc. 73]. On October 19, 2020, Defendant Miller and Defendant Western Surety filed a

Motion for Judgment on the Pleadings and a Motion for Summary Judgment. [Docs. 74, 75].

On October 19, 2020, the Deputy Defendants filed a Motion for Summary Judgment. [Doc. 78]. On October 23, 2020, the Deputy Defendants filed an Amended Answer. [Doc. 83]. The parties have responded and replied to all motions pending before the Court. [Docs. 84-89, 91-94, 96].

Having been fully briefed, this matter is ripe for disposition.

## II. STANDARD OF REVIEW

### A. Motions for Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers, admissions, stipulations, affidavits, and other materials on the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)&(c). "As the Supreme Court has observed, 'this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

4

"Facts are material when they might affect the outcome of the case, and a genuine issue exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020) (quoting News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010)). The Court does not make credibility determinations or weigh the evidence when ruling a motion for summary judgment. Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the nonmoving party who must convince the Court that a triable issue does exist. Id.

In considering the facts on a motion for summary judgment, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. Smith v. Collins, 964 F.3d 266, 274 (4th Cir. 2020).

## B.    Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move

5

for judgment on the pleadings." A Rule 12(c) motion tests only the sufficiency of the complaint and does not resolve the merits of the plaintiff's claims or any disputes of fact. Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014). A motion for judgment on the pleadings pursuant to Rule 12(c) is analyzed under the same standard as a motion to dismiss under Federal Rule of Civil Procure 12(b)(6). See id.; Burbach Broadcasting Co. of Delaware v. Elkins Radio Corp., 278 F.3d 401 (4th Cir. 2002). A court thus accepts all well-pled facts as true and construes the facts in the light most favorable to the plaintiff as the nonmoving party. Id. at 405-06; Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).

## III.   FACTUAL BACKGROUND[1]

During the period relevant to this case, Plaintiffs Hyatt and Barrett lived together in an apartment in Candler, North Carolina (the "Apartment"). [Doc. 68-2 at 2; Doc. 68-3 at 2].

Sometime before January 20, 2018, an individual contacted the Buncombe County Sheriff's Office to report increased vehicle and foot traffic at the Apartment. [Doc. 68-6 at 3, 8]. The individual spoke with Defendant

---

[1] This factual recitation is presented for the purposes of the Deputy Defendants' Motion for Summary Judgment, and Defendant Miller and Western Surety Company's Motion for Summary Judgment. Accordingly, the facts are presented in the light most favorable to the Plaintiffs. Adams. v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

May. [Id. at 1-3; Doc. 68-7 at 13]. In response to that tip, members of the Buncombe County Sheriff's Office surveilled the Apartment multiple times. [Doc. 68-6 at 8-9; Doc. 68-7 at 5]. On one of those occasions, Defendant May discovered that a car outside the Apartment had a stolen tag. [Doc. 68-7 at 5].

## A. The Stop and Search of Plaintiff Hyatt

On January 20, 2018, Defendant May was notified that a new car was at the Apartment. [Doc. 68-6 at 11]. Defendant May ran the car's tag information and learned that it was registered to Brandon Pickens, who had a criminal record that included drug trafficking convictions. [Id.]. Defendant May and Lambert drove to the Apartment to conduct additional surveillance. [Doc. 68-8 at 13]. During the surveillance, Plaintiff Hyatt and Pickens left the Apartment in a car. [Doc. 68-7 at 12-13]. Pickens was driving and Plaintiff Hyatt was in the passenger seat. [Id.].

Defendant May and Defendant Lambert followed. [Doc. 78-1 at 73]. Defendant May was driving a marked patrol car and Defendant Lambert was driving an unmarked car. [Id.]. When Defendant May's marked patrol car got close to Pickens and Plaintiff Hyatt's car, Pickens applied the brakes. [Doc. 78-2 at 8]. Because Defendant May was afraid that he had been

7

detected, he turned off the road and let Defendant Lambert continue following the car in his unmarked vehicle. [Id.].

Defendant Lambert followed the car for a quarter-mile and initiated a traffic stop at a gas station at 12:34 pm. [Doc. 68-8 at 4]. The reason for the stop is disputed. Defendant Lambert states that he stopped the car because it was quickly changing lanes without using a turn signal. [Doc. 68-7 at 13-14]. Plaintiff Hyatt states that the car never changed lanes after leaving the Apartment until it was stopped by Defendant Lambert. [Doc. 68-10 at 1-2].

When Defendant Lambert approached the car, he asked Pickens to show his hands because Pickens' "right hand was down below his right leg." [Doc. 68-7 at 14]. Plaintiff Hyatt states that Pickens never reached for anything or made any sudden movements. [Doc. 68-10 at 2]. Defendant Lambert told Pickens to exit the car because he was "holding his right hand down below his leg and" he had a "lengthy criminal history." [Doc. 68-7 at 14]. Pickens consented to a pat-down search but refused to let Defendant Lambert search his pockets. [Doc. 68-7 at 5, 14].

Buncombe County Sheriff's Sergeant Chris Stockton, Defendant May, and Defendant Lewis arrived shortly after Defendant Lambert initiated the traffic stop. [Id. at 12]. Defendant May told Plaintiff Hyatt to exit the car and

asked to search him for weapons. [Doc. 68-7 at 6]. Plaintiff Hyatt consented to a pat-down search of his person and let Defendant May search his pockets. [Doc. 68-6 at 9; Doc. 68-7 at 6]. Defendant May found $1,500 in cash in Plaintiff Hyatt's pocket and claims to have smelled crack cocaine on Plaintiff Hyatt during the search. [Doc. 68-6 at 10-12]. Defendant May is the only officer who claims to have smelled crack cocaine or any other type of drug during the traffic stop. [68-7 at 6-11, 13-16; Doc. 68-8 at 13; Doc. 68-11 at 3-4]. Plaintiff Hyatt disputes that Defendant May could have smelled crack cocaine on his person and claims that he was carrying the $1,500 for a trip to the casino. [Doc. 68-10 at 2; Doc. 68-4 at 14]. According to each Defendants Lambert, May, and Lewis, Plaintiff Hyatt and Pickens were nervous during the traffic stop. [Doc. 68-7 at 6, 12, 15].

Defendant Lambert instructed Defendant May to issue a ticket to Pickens. [Doc. 68-7 at 14]. While Defendant May was writing the ticket, Defendant Lambert used a drug dog to conduct a free air sniff around the exterior of the car. [Doc. 68-7 at 6, 14]. The dog's training records show that he typically turned his head and changed his breathing patterns when he first located the scent of drugs and that he performed a final trained response by lying or sitting on the ground when he located the source of the scent, even

when the source of the scent was inside of a car and the dog was outside of the car.  [Doc. 68-12 at 5-17].

Defendant Lambert claims that the dog alerted to the passenger-side door by displaying "a change in his breathing from his mouth to rapidly breathing through his nose" and alerted to the driver-side door by displaying "a quick head turn and then . . . changing his breathing from his mouth to rapidly breathing through his nose."  [Doc. 68-7 at 15].  It is undisputed, however, that the dog did not perform his "final trained response by sitting on lying on the ground" at any point when circling the car.  [Doc. 68-12 at 5-17].

After the dog allegedly alerted, Pickens and Plaintiff Hyatt were placed in handcuffs.  [Doc. 68-7 at 6, 15].  Defendant Lambert told Pickens and Plaintiff Hyatt that they were being handcuffed so they did not "do anything crazy."  [Doc. 71-8 at 12:44].  Defendant Lambert then searched the car's interior with the dog.  [Doc. 68-7 at 15].  During the search, Defendant Lambert claims that the dog alerted to the front passenger seat by changing "his breathing from his mouth to rapidly breathing through his nose" and by performing his "final trained response of lying down in the front passenger seat."  [Id.].  Although Defendant Lambert's body camera was on during the search, the footage does not show significant portions of the canine sniff

because Defendant Lambert was not facing the car. [Doc. 68-9 at 10:45-12:00]. Defendant Lambert claims that the dog was particularly focused on a black pouch on the passenger-side floorboard. [Doc. 68-8 at 17-18].

Defendant May and Lambert continued to search the car while Defendant Lewis watched Pickens and Plaintiff Hyatt. [Id.]. Defendant Lewis became nervous "that Pickens and Hyatt may try to run" because Plaintiff Hyatt was stretching and they allegedly "were making some sort of communication between the two of them." [Doc. 68-7 at 15]. The deputies decided to place Plaintiff Hyatt in the back of a patrol car. [Id.].[2]

Before placing Plaintiff Hyatt in the patrol car, Defendant Lambert searched Pickens and Hyatt again. [Id.]. Pickens told Defendant Lambert that he was touching his genitals during the search. [Id.]. Defendant Lambert claims that Pickens "began to say I was being gay for checking the area around his crotch" and that he had "seen this behavior before . . . to deter officers from completing the search." [Id.]. After the deputies were unable to find any drugs, Defendant May suggested conducting a strip

---

[2] Defendant Lambert says that they detained the men due to their "criminal history of assaultive behavior. . . and the possibility that they could have illegal narcotics on their person and it could be easily destroyed." [Doc. 68-7 at 16]. Defendant May says the men were detained due to "Pickens['] violent past and willingness to run and Hyatt`s nervousness. . . ." [Id. at 12].

11

search of Pickens and Plaintiff Hyatt "based on the fact that [Pickens] is a drug dealer and making those comments." [Doc. 68-7 at 7; Doc. 68-9 at 23:50-23:57].

Defendant Lambert used the dog to search the car for a second time. [Doc. 68-14 at 2:44-4:30]. Defendant Lambert claims that the dog alerted to the pouch on the front passenger side again. [Doc. 68-8 at 17-18]. Despite continuing the search, the deputies were unable to find any drugs. [Id.]. Defendant May told another deputy that "it's here but we just aren't finding it" and Defendant Lambert said that "with their history" and "with the dog alerting, I think we're good to do a search." [Doc. 68-14 at 4:55-5:31]. The deputies decided to strip search Plaintiff Hyatt and Pickens to look for drugs on their person. [Doc. 68-7 at 15-16]. Because Plaintiff Hyatt and Pickens refused to consent to a further search, the deputies began an application for a search warrant. [Doc. 68-15 at 0:30-1:30; Doc. 68-16; Doc. 68 at 15].

The deputies continued to search the vehicle while they waited for the search warrant to be prepared and presented to a magistrate. At roughly 3:05 p.m., more than two and a half hours after the initial traffic stop, Defendant May claims that he found a small amount of a white powdery substance in the car. [Doc. 68-6 at 5-6]. The deputies claim that the

12

substance tested positive for cocaine on a field test kit. [Doc. 68-6 at 5-6; Doc. 68-7 at 9, 15].

Plaintiff Hyatt disputes that Defendant May found a substance in the car. [Doc. 68 at 12]. Plaintiff Hyatt states that he could see the deputies from where he was sitting in the back of the patrol car and disputes that a field test was ever conducted. [Doc. 68-10 at 2-3; Doc. 68 at 12]. The deputies' body cameras did not capture the alleged discovery of the substance or the test because every deputy had their body camera turned off. [Doc. 68-20 at 1]. The entire substance was destroyed in the test. [Doc. 68-7 at 1].

The application for the search warrant was updated to reflect the discovery of the substance and the test result. [Doc. 68-7 at 2]. At 3:32 p.m., the magistrate signed a warrant to search Plaintiff Hyatt's person. [Doc. 68-18 at 15]. Defendant Lambert and Defendant May removed Plaintiff Hyatt from the patrol vehicle and walked him into the bathroom of the gas station to conduct a strip search. [Doc. 68-8 at 9-10; Doc. 68-6 at 12]. Plaintiff Hyatt claims that one of the deputies unholstered his gun or taser while they were in the bathroom. [Doc. 68-4 at 15-19]. During the strip search, Plaintiff Hyatt had to disrobe, bend over, squat, cough, and lift his genitalia. [Doc. 68-4 at

20; Doc. 68-8 at 10-11].  The strip search did not find any drugs.  [Doc. 68-7 at 1, 12, 16; Doc. 68-8 at 17].

Sergeant Stockton and Defendant May then conducted a similar strip search of Pickens in the gas station bathroom.  [Doc 68-7 at 10].  That search concluded at 4:05 p.m. and did not find any drugs.  [Id. at 4].  Pickens was given a traffic citation and left with Plaintiff Hyatt.  [Id. at 12].  The traffic stop lasted roughly three and a half hours and resulted in no drug charges against Pickens or Plaintiff Hyatt.  [Doc. 68-7 at 14].

### B. The Stop and Search of Plaintiff Barrett and the Apartment

While Pickens and Plaintiff Hyatt were being detained during the traffic stop, Defendant Lewis drove back to the Apartment to continue surveillance.  [Doc. 85-2 at 1].  Defendant Lewis ran the license plate of Plaintiff Barrett's car and discovered that the plate had been revoked.  In Defendant Lewis's experience, a revoked plate "usually indicates that there [is] an issue with insurance."  [Id. at 2].  Defendant Lewis observed Plaintiff Barrett get into her car and leave the Apartment.  [Id.].  Plaintiff Barrett intended to drive to Sylva, North Carolina, in order to pick up her son, who had been staying with Barrett's mother for a few days.  [Doc. 85-3 at 1].

Defendant Lewis followed Plaintiff Barrett and initiated a traffic stop at 3:41 p.m.  [Doc. 85-2 at 2; Doc. 85-4 at 15:41].  Defendant Lewis told Plaintiff

14

Barrett that Lewis stopped her because her "tag [was] revoked for insurance." [Doc. 85-3 at 2-3; Doc. 85-4 at 15:42]. Defendant Lewis asked Plaintiff Barrett if she could search the vehicle. [Doc. 85-4 at 15:44]. When Plaintiff Barrett asked Defendant Lewis why she wanted to search the vehicle, Defendant Lewis responded that "we just search every car we can[.]" [Id. at 15:44]. Defendant Lewis repeated her request to search the car, and Plaintiff Barrett refused. [Id.]. Defendant Lewis told Plaintiff Barrett to exit the car because Barrett would not "let [Lewis] search the car." [Id. at 15:45].

While Defendant Lewis stated that she was "not trying to coerce" Plaintiff Barrett into letting her search the car, she repeatedly asked to search the car and raised the prospect of towing the car for lacking insurance. [Doc. 85-4 at 15:48]. Plaintiff Barrett explained that she needed to go pick up her child. [Id. at 15:46]. After several minutes of discussion, Plaintiff Barrett allowed Defendant Lewis to search the car while she tried to obtain insurance for the car over the phone. [Id. at 15:49; Doc. 68-3 at 30-32]. Defendant Lewis searched the car and found no drugs.

Defendant Lewis told Plaintiff Barrett that "someone might be coming in a second to talk with you about some other stuff." [Doc. 85-4 at 15:54]. When Plaintiff Barrett asked Defendant Lewis who was coming, Defendant Lewis said that "there's a couple of ways that we can do things, there's hard

15

ways and there's easy ways." [Id. at 15:55]. Plaintiff Barrett asked

Defendant Lewis "am I going to jail for something?" [Id. at 15:56]. Defendant

Lewis responded "possibly, unless there is cooperation, and then we can talk

about things." [Id. at 15:56-15:57]. Defendant Lewis told Plaintiff Barrett that

the stolen tag on the car outside the Apartment gave the deputies enough

evidence to obtain a search warrant for the Apartment and that if Plaintiff

Barrett did not consent to a search, the deputies could detain her for as long

as three hours while they procured a search warrant. [Id. at 15:57-15:58].

Defendant Lewis said that it "could go two ways: we could detain you in

handcuffs, can't make phone calls, can't do anything like that," or Plaintiff

Barrett could give the deputies consent to search the Apartment. [Id. at

15:58-15:59].[3]

Around 3:59 p.m., Plaintiff Barrett obtained insurance for the vehicle

over the phone. [Id. at 15:59]. At the same time, Defendant Lambert arrived

at the traffic stop. [Doc. 85-5 at 16:00]. Defendant Lambert and Defendant

Lewis continued asking Plaintiff Barrett if she would consent to a search. [Id.

at 16:02]. Plaintiff Barrett started crying. [Id. at 16:02].

---

[3] Although the Deputy Defendants contend that "it is unclear what evidence Plaintiffs rely upon for the threat of handcuffs," [Doc. 96 at 10], Defendant Lewis can be clearly heard on the body camera footage telling Plaintiff Barrett that she may be detained in handcuffs if she refused to consent to a search. [Doc. 85-4 at 15:58-15:59].

Defendant Lewis asked Plaintiff Barrett if she wanted to go back to her house to continue talking. [Id.]. Plaintiff Barrett responded, "I don't really have a choice, do I?" [Id.]. Defendant Lewis told Plaintiff Barrett that "you 100% have choices." [Id.]. Plaintiff Barrett responded, "I know, but if I don't do it you guys are just going to arrest me anyway." [Id.]. Defendant Lambert said "we're not going to arrest you, we may detain you, but we're not going to arrest you because you say no." [Id.]. Defendant Lambert told Plaintiff Barret that Defendant Lewis "is going to tell you in just a second that you're free to leave" and that it was her choice whether they would search the Apartment. [Id. at 16:04]. Plaintiff Barrett told Defendants Lambert and Lewis that she was scared, but ultimately decided to return to the Apartment with them. [Id. at 16:05; Doc. 85-3 at 6].

Once Plaintiff Barrett and the deputies arrived at the Apartment, Plaintiff Barrett said that she "felt pressured" and refused to consent to a search of the Apartment. [Doc. 85-3 at 6]. The deputies told Plaintiff Barrett that they would get a warrant and knock down the door to search the Apartment if she did not consent. [Id. at 8]. Defendant Lewis told Plaintiff Barrett that "due to the stolen property on her curtilage, and the evidence and individuals that were found leaving her residence that we could at this moment seize the residence to obtain a search warrant . . . [and] that she

17

would not be able to enter the house while we waited for the search warrant to be signed."  [Doc. 78-1 at 29].   According to Defendant Lambert, the deputies advised Plaintiff Barrett "that she was free to leave if she wanted" but told her that "she could not go into the residence."  [Id. at 24].

Eventually, Plaintiff Barrett signed a document consenting to a search of the Apartment.  [Id. at 9].  During her deposition, Plaintiff Barrett testified that the deputies "coerced me into signing this paper.  It was either that or they were going to do it anyways, and I was going to have to pay for a door and everything else."  [Id.].

Defendants Lewis and May searched the Apartment while Plaintiff Barrett watched.  [Doc. 68-7 at 5; Doc. 68-7 at 12].   During the search, Defendants Lewis and May found two sets of digital scales and multiple small bags.  [Id.].  Defendants Lewis and May did not seize any drugs.  No criminal charges have been filed against Plaintiff Barrett or Plaintiff Hyatt stemming from the searches that were conducted on January 20, 2018.

## IV.    DISCUSSION

### A.    Official Capacity Claims against Deputy Defendants

Plaintiffs Hyatt and Barrett bring claims against the Deputy Defendants in their official capacities.  [Doc. 63 at ¶¶ 42-56, 85-96].  The Deputy Defendants are entitled to summary judgment on all claims brought against

18

them in their official capacities because those claims are properly brought against Sheriff Miller, who is their employer.  Carpenter v. Trammel, No. 1:18-CV-00016-MR-WCM, 2019 WL 2088424, at *5 (W.D.N.C. May 13, 2019) (Reidinger, J.) (citing Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004); Wright v. Town of Zebulon, 202 N.C. App. 540, 543-44, 688 S.E.2d 786, 789 (2010)).  Accordingly, the Deputy Defendants' Motion for Summary Judgment will be granted on the official capacity claims against them.

## B.    Plaintiff Hyatt's Claims

Plaintiff Hyatt brings claims against the Deputy Defendants under 42 U.S.C. § 1983, asserting violations of his Fourth Amendment rights, assault and battery, and false imprisonment and false arrest.  [Doc. 63 at ¶¶ 42-91]. The Deputy Defendants move for summary judgment on all of those claims, claiming that they lawfully seized Plaintiff Hyatt incident to the traffic stop, lawfully detained him, and lawfully searched him pursuant to a warrant.  [Doc. 78; Doc. 79 at 3-12].  The Deputy Defendants further contend that they are entitled to qualified immunity on Plaintiff Hyatt's claims.  [Doc. 79 at 21].

Plaintiff Hyatt first argues that the Deputy Defendants violated his Fourth Amendment rights when they initiated a traffic stop of the vehicle. [Doc. 63 at ¶¶ 41-45].

19

"The temporary detention of an individual by a police officer during a traffic stop constitutes a seizure within the meaning of the Fourth Amendment." United States v. Dodwell, No. 1:12-CR-93-MR-DLH, 2014 WL 1573755, at *18 (W.D.N.C. Apr. 21, 2014) (Reidinger, J.) (citations omitted), aff'd sub nom. United States v. Hill, 849 F.3d 195 (4th Cir. 2017). Accordingly, a traffic stop must be supported by probable cause or reasonable suspicion. United States v. Feliciana, 974 F.3d 519, 522 (4th Cir. 2020) (citations omitted).

An officer has probable cause to initiate a traffic stop based on a readily observed traffic violation. State v. Styles, 362 N.C. 412, 415-17, 665 S.E.2d 438, 440-41 (2008). Defendant Lambert contends that he had probable cause to stop Pickens and Plaintiff Hyatt because he saw Pickens commit a traffic violation by changing "lanes without using his turn signal" three times and "weaving in and out of traffic from the right lane to the left lane several times." [Doc. 68-7 at 14].[4] In contrast, Plaintiff Hyatt states in a sworn affidavit that the car never changed lanes until it was stopped by Defendant

---

[4] In North Carolina, a person who changes lanes without signaling commits a traffic violation if "the operation of any other vehicle may be affected by such movement." N.C. Gen. Stat. § 20-154(a). Because the Defendants have presented nothing to show that another vehicle was affected any alleged lane changes, the Defendants' forecast of evidence on this point is insufficient to support a finding of probable cause for the stop.

Lambert. [Doc. 68-10 at 1-2]. Because the parties present contradictory forecasts of evidence regarding whether Pickens changed lanes, there is a genuine issue of material fact as to whether Pickens committed a traffic violation. Accordingly, the Court cannot determine at the summary judgment stage if Defendant Lambert had probable cause to initiate the traffic stop. See Fridley v. Horrighs, 291 F.3d 867, 872 (6th Cir. 2002) ("In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible.").

Nevertheless, Defendant Lambert contends that he had reasonable suspicion to initiate the traffic stop. An officer has reasonable suspicion to initiate a traffic stop by showing "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Kansas v. Glover, ––– U.S. ––––, 140 S. Ct. 1183, 1187 (2020) (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Reasonable suspicion is a "commonsense, nontechnical" standard that relies on the judgment of experienced law enforcement officers, "not legal technicians." See Ornelas v. United States, 517 U.S. 690, 695 (1996) (internal quotation marks omitted). To support a finding of reasonable suspicion, the detaining officer must "either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely

21

to be indicative of some more sinister activity than may appear at first glance." See United States v. Foster, 634 F.3d 243, 248 (4th Cir. 2011). Accordingly, "an officer's articulated facts must in their totality serve to eliminate a substantial portion of innocent travelers before reasonable suspicion will exist." United States v. McCoy, 513 F.3d 405, 413 (4th Cir. 2008). Courts look to the totality of the circumstances in determining whether an officer had reasonable suspicion of criminal activity. United States v. Arvizu, 534 U.S. 266, 273 (2002).

As grounds for reasonable suspicion, Defendant Lambert argues that the deputies "observed Hyatt and Pickens exiting a suspected drug house, getting into a vehicle registered to a well-known high-level cocaine dealer, and abruptly braking as soon as they became aware of law enforcement behind them, even though they were going the speed limit." [Doc. 96 at 2].

"An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (citing Brown v. Texas, 443 U.S. 47, 99 (1979)). Likewise, an individual's "criminal record, standing alone, cannot justify a stop, although it can support a finding of reasonable suspicion when accompanied by more 'concrete' indications of criminal activity." United

States v. Bryant, 654 F. App'x 622, 627 (4th Cir. 2016) (citing United States

v. Sprinkle, 106 F.3d 613, 617 (4th Cir. 1997)).

Here, the Deputy Defendants have not provided any concrete indications that Pickens or Plaintiff Hyatt were engaged in criminal activity. Pickens applying the brakes upon seeing a marked patrol car is no indication of criminal activity. It is a common occurrence among the general law-abiding public and certainly does not eliminate "a substantial portion of innocent travelers." United States v. McCoy, 513 F.3d 405, 413 (4th Cir. 2008); see also United States v. Massenburg, 654 F.3d 480, 491 (4th Cir. 2011) (explaining that if "the ordinary response of the innocent . . . sufficed to create reasonable suspicion, then [the] reasonable suspicion requirement would become meaningless"). Although the deputies had received a tip about increased foot traffic and unfamiliar vehicles at the Apartment, that tip provided no additional indications of drug trafficking, such as the identity of those visitors, the length of the stops at the Apartment, or the presence of a drug odor. United States v. Velazco-Durazo, 372 F. Supp. 2d 520, 529 (D. Ariz. 2005) (explaining that police officers lacked reasonable suspicion based on a tip from neighbors who "reported seeing only three or four different vehicles, and the police had no information as to whether the people coming and going were residents, family members, frequent visitors, or

strangers."). With such little basis for suspecting criminal activity, the Deputy Defendants forecast of evidence is insufficient to support Defendant Lambert's conclusion of reasonable suspicion to initiate a traffic stop of Pickens and Plaintiff Hyatt.

Because there are genuine issues of material fact as to whether Defendant Lambert had either reasonable suspicion or probable cause to stop Pickens and Plaintiff Hyatt, the Court cannot determine the legality of the traffic stop on summary judgment.

Even so, Defendant Lambert claims that he is entitled to qualified immunity on Plaintiff Hyatt's claims for initiating the traffic stop. [Doc. 79 at 21-22]. The Deputy Defendants also claim that they are entitled to qualified immunity for any claims arising from their conduct during the traffic stop and the events thereafter. [Id.].

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In deciding whether a defendant is entitled to summary judgment as to qualified immunity, "courts engage in a two-pronged inquiry." Smith v. Ray, 781 F.3d

95, 100 (4th Cir. 2015). One prong "asks whether the facts, viewed in the light most favorable to the plaintiff, show that the [defendant]'s conduct violated a federal right." Id. The other prong "asks whether the right was clearly established at the time the violation occurred such that a reasonable person would have known that his conduct was unconstitutional." Id.[5] If either question is answered in the negative, qualified immunity is established and the claims must be dismissed. Estate of Sipes v. Cooper, No. 1:12-cv-00269-MR-DLH, 2013 WL 5797374, at *5 (W.D.N.C. Oct. 28, 2013) (Reidinger, J.). The question of whether a right is clearly established is a question of law for the court to decide. Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992). "The question of whether a reasonable officer would have known that the conduct at issue violated that right, however, cannot be decided prior to trial if disputes of the facts exist." Ray v. Roane, 948 F.3d 222, 228 (4th Cir. 2020) (citing Smith, 781 F.3d at 100). "Therefore, to the extent that a dispute of material fact precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal question

---

[5] The Court has "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

of whether the defendant is entitled to qualified immunity on the facts found by the jury." Willingham v. Crooke, 412 F.3d 553, 560 (4th Cir. 2005).

It is clearly established under the Fourth Amendment that individuals have the right to be free from unlawful seizures of their persons, including traffic stops that are not justified by probable cause or reasonable suspicion. Hicks v. Ferreyra, 965 F.3d 302, 307 (4th Cir. 2020). Accordingly, Defendant Lambert will not be entitled to qualified immunity if he initiated the traffic stop without probable cause or reasonable suspicion.

As discussed above, there are genuine issues of material fact as to whether Defendant Lambert had probable cause to initiate the traffic stop. Accordingly, the Defendants' Motion for Summary Judgment based on qualified immunity in initiating the traffic stop must be denied. Christian v. Payne, 748 F. App'x 504, 506 (4th Cir. 2018) (stating that a "genuine question of material fact regarding whether the conduct allegedly violative of the right actually occurred must be reserved for trial") (citing Schultz v. Braga, 455 F.3d 470, 476 (4th Cir. 2006)).

The Court also cannot determine as a matter of law whether the Deputy Defendants are entitled to qualified immunity on Plaintiff Hyatt's claims following the initial traffic stop. The parties present conflicting forecasts of evidence regarding significant events leading up to and during the traffic

26

stop, including whether Defendant May smelled crack cocaine on Plaintiff Hyatt [Doc. 68-6 at 10; Doc. 68-10 at 2]; whether the deputies recovered a substance from the car that tested positive for cocaine [Doc. 68-10 at 3; Doc. 68-7 at 12]; and whether the dog alerted at the car.[6] [Doc. 68 at 7-8, 17-19; Doc. 85 at 14; see also Doc. 68-10]. If Defendant Lambert's initial stop was not supported by probable cause, Plaintiff Hyatt's continued detention and subsequent strip search[7] by the Deputy Defendants would also be unlawful. See Johnson v. Anhorn, 416 F. Supp. 2d 338, 359 (E.D. Pa. 2006); Muir v.

---

[6] The Plaintiffs argue that whether the canine alerted is a question of fact for the Court to decide. [Doc. 85 at 14]. In support of that position, the Plaintiffs cite United States v. Wilson, where the Court granted a motion to suppress after finding that a canine handler incorrectly believed that his canine alerted. 995 F. Supp. 2d 455, 473 (W.D.N.C. 2014) (Reidinger J.). In Wilson, the question of the dog's alert was before the Court on a motion to suppress where the Court was the finder of fact. Unlike Wilson, this is a civil case with a jury demand. Accordingly, the jury must make the factual determinations, including whether the dog alerted. This is particularly true in a case such as this one where the video evidence of the dog's actions is far from conclusive as to whether the dog alerted.

Body cams and dash cams have become an integral part of policing. They are invaluable tools for showing what occurred and how law enforcements officers discharged their responsibilities. However, it is incumbent upon law enforcement officers to make certain that the video footage recorded on these devices captures what in fact occurred. This requires transparency of action, as well as trained and conscious use of such recording devices. When such video footage clearly shows what has occurred, law enforcement officers are protected from spurious lawsuits and citizens are protected from violations of their constitutional rights. When recording devices are used in such a way that there is great uncertainty as to what actually occurred, then jury trials become unavoidable.

[7] Although the search of Plaintiff Hyatt was supported by a duly issued warrant, these disputed factual issues were necessary to the probable cause needed to support the warrant. Therefore, there are genuine factual issues as to whether the warrant itself was valid.

Danner, No. 2:19-cv-00013, 2020 WL 4727072, at *5 (M.D. Tenn. Aug. 14, 2020), appeal dismissed, No. 20-5937, 2020 WL 6742325 (6th Cir. Sept. 16, 2020).

Because there are numerous factual issues regarding the Deputy Defendants' actions during the traffic stop, the Court cannot grant them summary judgment based on qualified immunity as to Plaintiff Hyatt's claims regarding the traffic stop, his continued detention or the subsequent strip search.

The Deputy Defendants further claim that they are entitled to public official immunity as to Plaintiff Hyatt's state law claims against them. [Doc. 79 at 22-24]. "The defense of public official immunity is a 'derivative form' of governmental immunity." Fullwood v. Barnes, 250 N.C. App. 31, 38, 792 S.E.2d 545, 550 (2016) (quoting Epps v. Duke Univ., Inc., 122 N.C. App. 198, 203, 468 S.E.2d 846, 850 (1996)). "Police officers engaged in performing their duties are public officials for the purposes of public official immunity. Lopp v. Anderson, 251 N.C. App. 161, 168, 795 S.E.2d 770, 776 (2016). "As long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability." Wilcox v. City of Asheville, 222 N.C. App. 285, 288,

730 S.E.2d 226, 230 (2012) (citation omitted). Thus, a public official is immune from suit unless the challenged action was (1) outside the scope of official authority, (2) done with malice, or (3) corrupt." Id. (citation omitted).

"'A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another.'" Showalter v. N.C. Dep't of Crime Control & Pub. Safety, 183 N.C. App. 132, 136, 643 S.E.2d 649, 652 (2007) (quoting Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984)). Thus, "a malicious act is an act (1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another." Wilcox, 222 N.C. App. at 289, 730 S.E.2d at 230. When considering a motion for summary judgment based on public official immunity, "the only issue is whether plaintiff sufficiently forecasted evidence for each element of malice." Brown v. Town of Chapel Hill, 233 N.C. App. 257, 265, 756 S.E.2d 749, 755 (2014) (citing Schlossberg v. Goins, 141 N.C. App. 436, 446, 540 S.E.2d 49, 56 (2000)). "If so, there is a genuine issue of material fact as to whether" the defendant is entitled to summary judgment. Id.

Plaintiff Hyatt argues that the Deputy Defendants are not entitled to public official immunity because their conduct was "malicious." [Doc. 85 at 19; Doc. 63 at ¶ 12]. To establish malice, Plaintiff Hyatt must first show that

the Deputy Defendants acted wantonly. "An act is wanton when it is done of wicked purpose or when done needlessly, manifesting a reckless indifference to the rights of others." Brown v. Town of Chapel Hill, 233 N.C. App. 257, 269, 756 S.E.2d 749, 758 (2014) (citation and quotations omitted). As discussed above, there are genuine issues of fact as to several events that occurred during the traffic stop. Taking the evidence in the light most favorable to Plaintiff Hyatt, a reasonable jury could conclude that the Deputy Defendants unlawfully seized Plaintiff Hyatt without probable cause or reasonable suspicion and then manufactured a positive canine alert and a positive cocaine test to obtain a warrant to strip search Plaintiff Hyatt. If so, the jury could conclude that the Deputy Defendants falsely made those claims with a wicked purpose or with reckless indifference to Plaintiff Hyatt's rights. Brown, 233 N.C. App. at 269, 756 S.E.2d at 758; Russ v. Causey, 468 F. App'x. 267, 276 (4th Cir. 2012) (explaining that "North Carolina courts have found summary judgment inappropriate where there is a genuine issue of fact as to an officer's state of mind when engaging in allegedly tortious conduct."). Accordingly, there are questions of fact as to whether the Deputy Defendants acted wantonly.

Plaintiff Hyatt next must show that the Deputy Defendants' acts were contrary to duty. An officer who seizes an individual without probable cause

or reasonable suspicion acts contrary to duty.  State v. Milien, 144 N.C. App. 335, 339, 548 S.E.2d 768, 771 (2001); Brown, 233 N.C. App. at 265, 756 S.E.2d at 755.  As discussed above, there are genuine issues of material fact as to whether Defendant Lambert had probable cause to initiate a traffic stop.  Moreover, there are genuine issues of fact as to whether Defendant Lambert falsely claimed that the dog alerted and whether the Deputy Defendants included false allegations on their application for a search warrant of Plaintiff Hyatt.  Mejia v. Bowman, 246 N.C. App. 516, 785 S.E.2d 185 (2016).  Accordingly, there are genuine issues of material fact as to whether the Deputy Defendants acted contrary to duty.

Plaintiff Hyatt must also show that the Deputy Defendants' actions were "intended to be injurious to another."  Wilcox, 222 N.C. App. at 289, 730 S.E.2d at 230.  A plaintiff merely needs to show an intent to prejudice legal rights, not an intent to cause a physical injury.  Mejia v. Bowman, 246 N.C. App. 516, 785 S.E.2d 185 (2016) (explaining that a trial court improperly granted an officer's motion for summary judgment based on public official immunity when the plaintiff had presented evidence that the officer "arrested her for no reason and then lied to a magistrate.").  As discussed above, there are genuine issues of material fact as to whether Defendant Lambert unlawfully stopped Plaintiff Hyatt and whether the Deputy Defendants

included false allegations in their application for a search warrant. Accordingly, there are questions of fact as to whether the Deputy Defendants acted with an intent to injure Plaintiff Hyatt's legal rights.

Accepting Plaintiff Hyatt's testimony as true and considering the video evidence, there are genuine issues of material fact as to whether the Deputy Defendants acted contrary to duty, wantonly, and with an intent to injure Plaintiff Hyatt. Accordingly, the Court cannot grant the Deputy Defendants' Motion for Summary Judgment as to their public official immunity on Plaintiff Hyatt's claims.[8]

### B. Plaintiff Barrett's Claims

Plaintiff Barrett brings claims against Defendants Lambert and Lewis, asserting that they unlawfully prolonged her detention during the traffic stop and unlawfully coerced her into consenting to a search of her car and the Apartment. [Doc. 63 at ¶¶ 97-114]. The Deputy Defendants move for summary judgment on those claims, claiming that they lawfully seized Plaintiff Barrett incident to a traffic stop and that she consented to the

---

[8] The Fourth Circuit has noted that "the issue of whether public official immunity can apply to intentional tort claims, like the plaintiffs' assault claim, splits courts in North Carolina." Hensley v. Price, 876 F.3d 573, 587 (4th Cir. 2017) (collecting cases). Because the Court finds that public official immunity does not apply here, the Court need not resolve this issue at this time.

searches. [Doc. 78; Doc. 79 at 15-21]. The Deputy Defendants further assert that they are entitled to qualified immunity. [Doc. 79 at 21].

### 1. Continued Detention After Traffic Stop

Plaintiff Barrett first brings claims related to her continued detention during the traffic stop. [Doc. 63 at ¶ 85-91, 97-114]. It is undisputed that Defendant Lewis had probable cause for the initial traffic stop because Plaintiff Barrett was operating a vehicle with a revoked tag. [Doc. 85 at 7]. It only took Plaintiff Barrett approximately 18 minutes to get the insurance for her car reinstated, thereby removing the basis for the revocation of her tag. [Doc. 85-4 at 15:59; Doc. 85-5 at 16:00-16:04]. According to Plaintiff Barrett, Defendant Lewis lacked probable cause or reasonable suspicion to continue detaining her after she obtained insurance. [Doc. 85 at 20]. Defendants Lambert and Lewis argue that Plaintiff Barrett voluntarily remained at the traffic stop, that they did not detain her, and that even if they detained her, such detention was justified by reasonable suspicion. [Doc. 79 at 16-18]. Accordingly, the question before the Court is whether Defendants Lambert and Lewis detained Plaintiff Barrett after she obtained insurance and, if so, whether that detention was justified by probable cause or reasonable suspicion.

33

According to Plaintiff Barrett, Defendant Lewis lacked probable cause or reasonable suspicion to continue detaining her after she obtained insurance. [Doc. 85 at 20]. Defendants Lambert and Lewis argue that Plaintiff Barrett voluntarily remained at the traffic stop, that they did not detain her, and that even if they detained her, such detention was justified by reasonable suspicion. [Doc. 79 at 16-18].

"A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, 575 U.S. 348, 354 (2015). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns[.]" Id. (citations omitted). "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose." Id. (citation, quotations, and brackets omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id. (citation omitted). Officers may extend a traffic stop after the initial justification has terminated if they receive consent or if they develop reasonable suspicion of ongoing criminal activity. United States v. Palmer, 820 F.3d 640, 649–50 (4th Cir. 2016) ("[A]n officer cannot investigate a matter outside the scope of the initial stop unless he receives the motorist's

34

consent or develops reasonable, articulable suspicion of ongoing criminal activity.").

The Supreme Court has stated that the appropriate inquiry for determining whether an encounter with law enforcement was consensual is whether a reasonable person would have felt free to decline the officers' requests or otherwise terminate the encounter. Florida v. Bostick, 501 U.S. 429, 436 (1991). The inquiry examines the totality of the circumstances, including "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." United States v. Weaver, 282 F.3d 302, 312 (4th Cir. 2002). "[C]onsent is an issue of fact, and a determination of whether a particular consent is truly voluntary is made by examining the totality of the circumstances surrounding

35

the consent." United States v. Rusher, 966 F.2d 868, 877 (4th Cir. 1992)

(citing Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)).[9]

Here, Plaintiff Barrett had been removed from her car and was being

questioned by two deputies on the side of the road when she obtained

insurance.  [Doc. 85-5 at 16:00].  During that questioning, Defendant Lewis

told Plaintiff Barrett that the deputies could detain her "in handcuffs" for up to

three hours if she did not consent to the search and that she was "possibly"

going to be taken to jail "unless" she cooperated.   [Id. at 15:58-15:59].

Although Plaintiff Barrett never specifically asked the deputies if she was free

to leave, she did ask the deputies if she would be arrested for refusing to

consent a search of the Apartment.  [Id. at 16:00-16:04].  The deputies

responded that she had "choices," but that they "may detain" her if she

refused to consent.   [Id. at 16:00-16:04].   Defendant Lambert later told

Plaintiff Barrett that "[Defendant Lewis is] going to tell you in just a second

that you're free to leave . . ."  [Id. at 16:04-16:05].

---

[9] In a criminal case, the government has "the burden of establishing, by a preponderance of the evidence, that it obtained valid consent to search." United States v. Toyer, 414 F. App'x. 584, 588 (4th Cir. 2011) (citing United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007); United States v. Block, 590 F.2d 535, 539 (4th Cir. 1978)); see also United States v. Robertson, 736 F.3d 677, 680 (4th Cir. 2013).  The Fourth Circuit has explained that "[t]he circuit courts are not in agreement about which party bears the burden of proof in a civil suit that alleges a constitutional violation based on involuntary consent." Trulock v. Freeh, 275 F.3d 391, 401 n.4 (4th Cir. 2001) (collecting cases).  The party that bears the burden of establishing consent is not relevant to the Court's analysis here.

The forecast of evidence, when viewed in the light most favorable to Plaintiff Barrett, establishes that Plaintiff Barrett continued to be detained after she had obtained insurance and the justification for the traffic stop had ended. Implicit in Defendant Lambert's statement that she would be told that she was free to leave in "just a second" is that Plaintiff Barrett was, in that moment, detained. Moreover, the deputies implied that Plaintiff Barrett could not leave by telling her she might be taken to jail "unless" she cooperated and that she may be detained "in handcuffs" if she did not consent to a search. Because Plaintiff Barrett had not consented to the search, she could have reasonably believed that she was going to be taken to jail or detained in handcuffs. Viewing those circumstances in the light most favorable to Plaintiff Barrett, a reasonable jury could conclude that Plaintiff Barrett did not voluntarily consent to remain at the traffic stop after she obtained insurance and instead was detained by Defendants Lambert and Lewis.

Defendants Lambert and Lewis alternatively argue that their detention of Plaintiff Barrett was lawful because they had reasonable suspicion that she was involved in illegal drug activity. [Doc. 79 at 17]. Specifically, Defendants Lambert and Lewis highlight that Plaintiff Barrett was nervous and shaking when the deputies were questioning her. [Id.]. The deputies also point to Plaintiff Barrett's statements that she did not know what was in

37

her car because her friend had been driving the vehicle and that she did not know what Plaintiff Hyatt might have in the Apartment. [Id.]. Defendants Lambert and Lewis argue that they "had been unable to find anything in Pickens' Lexus or on Hyatt's person to explain the drug odor that [the drug dog] repeatedly told them was there[,]" which "left one remaining plausible explanation—Hyatt left the drugs inside Barrett's [A]partment." [Id.].[10]

As the Supreme Court has stated, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." Illinois v. Wardlow, 528 U.S. 119, 124 (2000). Nevertheless, the Fourth Circuit has recognized on multiple occasions that "a driver's nervousness is not a particularly good indicator of criminal activity, because most everyone is nervous when interacting with the police." Palmer, 820 F.3d at 652–53 n.7; see also United States v. Bowman, 884 F.3d 200, 214 (4th Cir. 2018). Here, Plaintiff Barrett was being questioned by two deputies on the side of the road after having her car searched. The two deputies were trying to persuade Plaintiff Barrett into consenting to a search of her home. Plaintiff Barrett knew that deputies

---

[10] This remarkable assertion ignores a host of other plausible explanations. To begin, it assumes that the dog actually alerted. Based on the forecast of evidence, a jury could find that there was no alert. Even assuming that the dog actually alerted, it may have been a false alert, or the deputies simply may have failed to find the drugs to which the dog alerted. It is also possible the dog alerted to a scent of drugs that had been sold or moved to a different location. It does not follow that there *must be* drugs in the Apartment simply because the deputies did not find drugs in the car after the dog alerted.

38

had already detained her boyfriend and were obtaining a warrant to search him. Those circumstances are enough to cause anyone to be nervous. Accordingly, Plaintiff Barrett's nervousness "is of limited value" to the reasonable suspicion analysis. United States v. Massenburg, 654 F.3d 480, 490 (4th Cir. 2011).

Plaintiff Barrett's statements regarding the contents of her car and the Apartment provided little reason for the officers to suspect that she was engaged in criminal activity. While Plaintiff Barrett's disavowal of her car's contents ordinarily might weigh in favor of reasonable suspicion that she was involved in criminal activity, she already had consented to a search of her car and Defendant Lewis found nothing in the car to suggest that Plaintiff Barrett was engaged in criminal activity. Moreover, Plaintiff Barrett's uncertainty about what *Plaintiff Hyatt* might have in the Apartment provides little reason to detain Plaintiff Barrett due to suspicions that she was involved in ongoing criminal activity herself.

In sum, the deputies had little reason to suspect that Plaintiff Barrett was engaged in ongoing criminal activity. Assessing the totality of the circumstances in the light most favorable to Plaintiff Barrett, a reasonable jury could conclude that the deputies lacked reasonable suspicion to detain Plaintiff Barrett after she obtained insurance for the vehicle. Accordingly, the

Deputy Defendants' Motion for Summary Judgment will be denied as to Plaintiff Barrett's claims for false arrest and false imprisonment and for unlawful seizure with regard to Defendants Lambert and Lewis's continued detention after she obtained insurance.

Defendants Lambert and Lewis nevertheless contend that they are entitled to qualified immunity for continuing to detain Plaintiff Barrett. [Doc. 85 at 24]. It is clearly established under the Fourth Amendment that individuals have the right to be free from unlawful seizures of their persons, including traffic stops that are not justified by probable cause or reasonable suspicion. Hicks v. Ferreyra, 965 F.3d 302, 307 (4th Cir. 2020). A reasonable officer in the position of Defendants Lambert and Lewis would have known that it was unlawful to continue detaining Plaintiff Barrett after the justification for the traffic stop had ended. Moreover, a reasonable officer in his or her position would have known that Plaintiff Barrett was not voluntarily consenting to the prolonging of the encounter. Indeed, Defendant Lambert seems to have known that they were detaining Plaintiff Barrett without justification and needed to let her go when he said that she would be able to leave "in just a second." [Doc. 85-4 at 16:04]. Viewing the evidence in the light most favorable to Plaintiff Barrett, Defendants Lambert and Lewis violated Plaintiff Barrett's clearly established constitutional rights by

continuing to detain her after she had obtained insurance. Accordingly, Defendants Lambert and Lewis's claim of qualified immunity will be denied.

Defendants Lambert and Lewis claim that they are entitled to public official immunity as to Plaintiff Barrett's state-law claims for false imprisonment and false arrest stemming from her continued detention at the traffic stop. The Fourth Circuit has explained that "public officers' immunity, at the least, is unavailable to officers who violate clearly established rights because an officer acts with malice when he 'does that which a man of reasonable intelligence would know to be contrary to his duty.'" Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003) (quoting Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984)). Moreover, the Fourth Circuit has explained that public official immunity for a North Carolina false imprisonment claim is properly denied when the defendant has been denied qualified immunity as to that claim. Johnson v. City of Fayetteville, 91 F. Supp. 3d 775, 816 (E.D.N.C. 2015) (citing Bailey, 349 F.3d at 742-45). Because the Court has concluded that Plaintiff Barrett's claims related to her continued detention survive summary judgment and that Defendants Lambert and Lewis are not entitled to qualified immunity on those claims, Plaintiff Barrett's state-law claims against Defendants Lambert and Lewis also survive summary judgment and Defendants Lambert and Lewis are not

41

entitled to public officer's immunity on those claims. <u>Bailey</u>, 349 F.3d at 742;

<u>Morgan v. Spivey</u>, No. 5:16-CV-365-FL, 2019 WL 81480, at *24 (E.D.N.C.

Jan. 2, 2019) (denying public official immunity on state-law claims that

survived summary judgment and were denied qualified immunity).

### 2.    Car Search

Plaintiff Barrett next brings claims related to the search of her car.  It is

undisputed that Defendant Lewis received consent to search the car during

the lawful portion of the traffic stop.  Accordingly, Plaintiff Barrett must show

that her consent was unlawfully obtained to establish that the search of her

car was unlawful.  <u>United States v. Lattimore</u>, 87 F.3d 647, 650 (4th Cir.

1996).

"[W]hether a consent to a search was in fact voluntary or was the

product of duress or coercion, express or implied, is a question of fact to be

determined from the totality of all the circumstances." <u>Schneckloth v.</u>

<u>Bustamonte</u>, 412 U.S. 218, 248-49 (1973) (internal quotation marks omitted).

"Factors that are appropriate for the district court to consider include the

characteristics of the accused (such as age, maturity, education, intelligence,

and experience) and the conditions under which the consent to search was

given (such as the officer's conduct, the number of officers present, and the

duration of the encounter)." <u>United States v. Boone</u>, 245 F.3d 352, 362 (4th

Cir. 2001).  An individual who is detained can still provide voluntary consent. See United States v. Watson, 423 U.S. 411, 424 (1976) ("the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search"); Boone, 245 F.3d at 362 ("If an individual voluntarily consents to a search while justifiably detained on reasonable suspicion, the products of the search are admissible.").

Plaintiff Barrett initially refused Defendant Lewis's request to search the car.  [Doc. 85-4 at 15:44].  After that, Defendant Lewis opened the car door and told Plaintiff Barrett to get out of the car.  [Id. at 15:45].  When Plaintiff Barrett asked why Defendant Lewis wanted her to exit the car, Defendant Lewis told her that she wanted her out of the car because she would not "let [Defendant Lewis] search the car."  [Id. at 15:45]. Once Plaintiff Barrett was out of the car, Defendant Lewis raised the prospect of towing the car for lacking insurance.  [Id. at 15:48].  When Plaintiff Barrett protested, Defendant Lewis told her that she could try to get insurance over the phone. [Id. at 15:48].  Shortly thereafter, Plaintiff Barrett gave Defendant Lewis consent to search the car.  [Id.; Doc. 85-3 at 4-5].

Viewing the evidence in the light most favorable to Plaintiff Barrett, a reasonable jury could conclude that Plaintiff Barrett did not voluntarily consent to search of her car.  Plaintiff Barrett refused several requests to

43

consent to a search and was then ordered out of her car by a police officer explicitly because she refused to consent to a search. Once Plaintiff Barrett was out of the car and on the side of the highway, Defendant Lewis explicitly raised the prospect of towing the car for lacking insurance and suggested that Plaintiff Barrett could avoid having her car towed if she could obtain insurance during the stop. This threat of towing is an indirect threat of an action that would have imposed a significant financial burden on Plaintiff Barrett. Viewing the evidence in the light most favorable to Plaintiff Barrett, a jury could conclude that Plaintiff Barrett consented to the search to buy time to obtain insurance only because Defendant Lewis had threatened to tow her car.

Defendant Lewis nevertheless contends that she is entitled to qualified immunity on Plaintiff Barrett's claims regarding the car search. [Doc. 85 at 24]. To begin, it is clearly established that the Fourth Amendment protects individuals against searches based on consent that is involuntarily given. Pegg v. Klempa, 651 F. App'x 207, 213 (4th Cir. 2016). Accordingly, the question facing the Court is whether Defendant Lewis could have reasonably believed that her actions were lawful. Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) ("Qualified immunity protects officers who commit

constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.").

Crucial to this analysis is the undisputed fact that Defendant Lewis obtained Plaintiff Barrett's consent to search before Plaintiff Barrett obtained the insurance. As such, Plaintiff Barrett and the vehicle were still lawfully detained. Moreover, Defendant Lewis correctly asserted that she had the legal authority to tow a vehicle that was not covered by insurance. Thus, Defendant Lewis could quite reasonably have believed that her actions in obtaining that consent were within the bounds of the law.

The Court concludes that an officer in Defendant Lewis's position could have reasonably believed that her actions were lawful. Determining the voluntariness of consent is a particularly fact-based inquiry and depends greatly on the circumstances of the case. Schneckloth, 412 U.S. at 226 (surveying case law on the voluntariness of consent and explaining that "none of [the prior decisions] turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances"). While Defendant Lewis may have negated Plaintiff Barrett's ability to consent freely and voluntarily by threatening to tow her car, an officer in Defendant Lewis's position may have reasonably believed that such threats were lawful and thus Barrett's consent was voluntary.

Moreover, no materially similar, pre-existing case law would have made it clear to a reasonable police officer in the circumstances that Plaintiff Barrett's consent was involuntary. Accordingly, Defendant Lewis is entitled to qualified immunity for Plaintiff Barrett's claims related to the search of the car.

### 3. Apartment Search

Plaintiff Barrett next brings claims related to the search of the Apartment. Because it is undisputed that Plaintiff Barrett signed a consent form giving the deputies consent to search the Apartment, the relevant question is whether Plaintiff Barrett's consent was given involuntarily. Lattimore, 87 F.3d at 650.[11] Plaintiff Barrett claims that the deputies coerced her into consenting to the search of the Apartment by threatening to kick down her door and threatening to detain her in handcuffs while they prepared an application for a search warrant. [Doc. 85 at 20-23].

"The question whether consent to search is voluntary — as distinct from being the product of duress or coercion, express or implied — is one 'of

_____

[11] The Fourth Circuit and several other Courts of Appeals have held that consent can be voluntary even if it is procured during an illegal detention, provided that the totality of the circumstances confirms that the consent was not coerced. United States v. Boone, 245 F.3d 352, 363 (4th Cir. 2001) (citing United States v. Beason, 220 F.3d 964, 966–67 (8th Cir. 2000); United States v. Guimond, 116 F.3d 166, 170-71 (6th Cir. 1997); United States v. Thompson, 106 F.3d 794, 798 (7th Cir. 1997)). Accordingly, the issue with the search of the Apartment is whether Plaintiff Barrett's consent was coerced, not whether she was unlawfully detained at the traffic stop or at the Apartment.

46

fact to be determined from the totality of all the circumstances.'" United States v. Azua-Rinconada, 914 F.3d 319, 324 (4th Cir. 2019) (quoting Schneckloth, 412 U.S. at 227). "While officers are certainly allowed to inform the public of lawful consequences of a refusal to consent, including the obtainment and execution of a search warrant, the manner in which the message is conveyed is relevant to a determination of voluntariness." Gem Fin. Serv., Inc. v. City of New York, 298 F. Supp. 3d 464, 488 (E.D.N.Y. 2018), as amended (June 27, 2018). The Fourth Circuit has held that consent is not involuntary solely because the officers ordered an individual to "open the door or we're going to knock it down." Azua-Rinconada, 914 F.3d at 324. "Written consent supports a finding that the consent was voluntary." United States v. Boone, 245 F.3d 352, 362 (4th Cir. 2001) (citing United States v. Navarro, 90 F.3d 1245, 1257 (7th Cir. 1996)).

Here, viewing the totality of the circumstances in the light most favorable to Plaintiff Barrett, the deputies coerced her into consenting to the search. In addition to threatening to kick down the door of the Apartment, the deputies threatened to place Plaintiff Barrett in handcuffs and prevent her from entering the Apartment or making phone calls. [Doc. 85-4 at 15:58-15:59]. While law enforcement officers may effectively impound homes while they are preparing and submitting a search warrant application, Illinois v.

McArthur, 531 U.S. 326, 331 (2001), the deputies had no legal justification to detain Plaintiff Barrett in handcuffs or prevent her from making phone calls while the search warrant application was being prepared and submitted.[12] Although Plaintiff Barrett signed a written form consenting to the search, that written consent carries less weight because Plaintiff Barrett signed the form after the deputies made their threats. Under these circumstances, a reasonable jury could find that the deputies coerced Plaintiff Barrett into consenting to the search. We Buy, Inc. v. Town of Clarkstown, No. 06-CV-1794, 2006 WL 3016314, at *8 (S.D.N.Y. Oct. 20, 2006) ("[A] jury could find that, under the circumstances, the police were not merely providing . . . information on which to base their decision, but attempting to overcome their resolution not to consent.").

---

[12] While law enforcement officers may temporarily detain individuals during the execution of a search warrant to (1) prevent flight of the individual if incriminating evidence is found, (2) minimize the risk of harm to the police, and (3) facilitate the orderly completion of the search, Michigan v. Summers, 452 U.S. 692, 702–03 (1981), the Supreme Court has counseled that law enforcement should use "a significantly less restrictive restraint" when the detention is pending the procurement of a search warrant. McArthur, 531 U.S. at 332. The Deputy Defendants do not contend that they needed to place Plaintiff Barrett in handcuffs to prevent her from fleeing, to minimize the risk of harm, or to facilitate the completion of the search. In fact, the Deputy Defendants provide no justification for their threat to detain Plaintiff Barrett in handcuffs and prevent her from making phone calls while they procured a search warrant.

Defendants Lambert and Lewis nevertheless contend that they are entitled to qualified immunity on Plaintiff Barrett's claims regarding the search of the Apartment. [Doc. 85 at 24].

At the time of the search, it was clearly established that a person can consent to a search of her apartment without a warrant. "Valid consent is a well-recognized exception to the Fourth Amendment prohibition against warrantless searches." Trulock v. Freeh, 275 F.3d 391, 401 (4th Cir. 2001). Accordingly, the question facing the Court is whether the deputies could have reasonably believed that their actions in searching the Apartment upon obtaining Plaintiff Barrett's consent were lawful. Henry, 652 F.3d at 531.

The Court concludes that Defendants Lambert and Lewis are entitled to qualified immunity regarding the search of the Apartment. Threatening to break down a door is not so coercive as to negate consent. Azua-Rinconada, 914 F.3d at 324 (stating that consent is not involuntary solely because the officers ordered an individual to "open the door or we're going to knock it down"). Likewise, there are circumstances where law enforcement officers can detain a resident in handcuffs during a search. See Summers, 452 U.S. at 702-03. Therefore, even if a jury could find the totality of these combined circumstances sufficient to negate consent, it was not clearly established that employment of such combination of actions in order

49

to secure consent violated constitutional norms. Moreover, the deputies obtained written consent from Plaintiff Barrett in an attempt to ensure that her consent was being voluntarily given. United States v. Boone, 245 F.3d 352, 362 (4th Cir. 2001) (stating that "[w]ritten consent supports a finding that the consent was voluntary.") (citation omitted). Thus, the Deputy Defendants could reasonably have believed their actions to have been in compliance with the law. Because a reasonable officer in that position may have been unaware that her threats to Plaintiff Barrett were coercive, Defendants Lambert and Lewis are entitled to qualified immunity at to Plaintiff Barrett's claims trespass to property and unlawful search in violation of the Fourth Amendment.

For these reasons, the Court concludes that Defendant Lewis is entitled to qualified immunity as to Plaintiff Barrett's claims related to their search of the car, and that Defendants Lambert and Lewis are entitled to qualified immunity as to Plaintiff Barrett's claims related to the search of the Apartment. Accordingly, the Deputy Defendants' Motion for Summary Judgment will be granted on Plaintiff Barrett's claims for trespass to property and unlawful search. The Deputy Defendants' Motion for Summary Judgment will be denied with regard to Plaintiff Barrett's claims for false

imprisonment and false arrest and unlawful seizure related to her continued detention.

### C. Defendants Miller and Western Surety Company's Motion for Summary Judgment and Motion for Judgment on the Pleadings

In their Complaint, the Plaintiffs assert state law claims against Sheriff Miller in his official capacity and a claim against Western Surety Company on the Sheriff's surety bond. [Doc. 63 at ¶¶ 42-56, 85-96, 115-118]. While appearing to limit their claims against these Defendants to state law claims, the Plaintiffs nonetheless allege that "Sheriff Miller is the final policymaker for the Department [sic] for purposes of § 1983." [Id. at ¶ 6]. Thus, it is unclear from the face of the Complaint whether the Plaintiffs also intend to assert claims against these Defendants under § 1983.

In light of the ambiguous nature of the pleading, Defendants Miller and Western Surety Company move for summary judgment to the extent that the Plaintiffs are attempting to assert any § 1983 claims against them. For grounds, the Defendants argue that the Plaintiffs' Complaint does not clearly assert § 1983 claims against Defendant Miller in his official capacity, and further, that such claims cannot be brought against Defendant Western Surety Company as a private corporation. [Doc. 75; Doc. 75-1].

The Plaintiffs agree that they did not bring any § 1983 claim against Defendant Miller or Western Surety Company. [Doc. 86]. Accordingly, to the extent that the Plaintiff's Third Amended Complaint could be construed to state such claims, those claims are dismissed.

Defendants Miller and Western Surety Company also move for judgment on the pleadings with respect to the Plaintiffs' state-law claims against them. [Doc. 74]. Defendants Miller and Western Surety Company argue that the Third Amended Complaint fails to allege respondeat superior liability and that, in any event, the Plaintiffs cannot establish respondeat superior liability because the Third Amended Complaint alleges that the Deputy Defendants are being sued for "conduct outside the scope of their authority." [Doc. 74-1 at 16-17 (citing Doc. 63 at ¶ 12)].

To begin, the Court concludes that the Third Amended Complaint states a state-law claim against Sheriff Miller. While the Third Amended Complaint does not specifically allege that Defendant Miller is responsible based on principles of respondeat superior, it alleges that the Deputy Defendants were on duty for the Buncombe County Sheriff's Office at the time of the relevant events and that they were engaged in law enforcement duties. [Doc. 63 at ¶¶ 10-11, 13-38]. The Third Amended Complaint further alleges that Defendant Miller is responsible for "control and operation" of the

52

Buncombe County Sheriff's Department, including the "deputies under this command." [Id. at ¶¶ 6-7]. Construing the Third Amended Complaint liberally, the Plaintiffs have provided sufficient notice and have alleged sufficient facts to state an official capacity claim against Defendant Miller. Bell Atlantic Corp. v. Twombley, 550 U.S. 544, 570 (2007).

The Third Amended Complaint further states that "[t]o the extent the Deputies assert public official immunity, Deputies are sued individually for conduct outside the scope of their authority and for malicious, willful and wanton disregard for the Plaintiffs' rights, safety, and dignity." [Doc. 63 at ¶ 12]. That allegation was directed at the Deputy Defendants' anticipated defense of public official immunity, [Doc. 86 at 7], which requires the Deputy Defendants' actions to have been "(1) outside the scope of official authority, (2) done with malice, or (3) corrupt." Wilcox v. City of Asheville, 222 N.C. App. 285, 288, 730 S.E.2d 226, 230 (2012) (citation omitted). The Plaintiffs now argue that the allegation in the Third Amended Complaint was inartfully drafted and should have asserted that the Deputy Defendants acted outside of the scope of their authority *or* with malice *or* with willful and wanton disregard for the Plaintiffs' rights, safety, and dignity. [Doc. 86 at 7]. Indeed, the Plaintiffs' response to the Deputy Defendants' Motion for Summary Judgment contends that the Deputy Defendants' actions meet the malice

exception to public official immunity, not the exception for acts taken outside the scope of authority.  [Doc. 85 at 19].

The Plaintiffs' allegations made it clear that they were pursuing a claim against Defendant Miller for his deputies' actions and that those actions were taken in the course of their employment under North Carolina law.  That is sufficient to state an official capacity claim.  Accordingly, Defendants Miller and Western Surety Company's Motion for Judgment on the Pleadings will be denied as to the state-law claims.

Next, Defendants Miller and Western Surety Company argue in their Motion for Judgment on the Pleadings that the Third Amended Complaint improperly asserts that the Plaintiffs can "sue repeatedly on the bond [issued by Western Surety Company for Sherriff Miller] until the judgment is paid." [Doc. 74-1 at 18-19 (quoting Doc. 63 at ¶ 116)].  Instead, Defendants Miller and Western Surety Company argue that the Plaintiffs' recovery is limited to the amount of the bond.  [Id. at 19].

N.C. Gen. Stat. § 58-76-5 states that "[e]very person injured by the neglect, misconduct, or misbehavior in office of any . . . sheriff . . . may institute a suit or suits against said officer or any of them and their sureties." A plaintiff's damages are limited to the extent to which the claims are covered under the bond purchased.  White v. Cochran, 229 N.C. App. 183, 190, 748

S.E.2d 334, 339 (2013). Accordingly, to the extent that the Plaintiffs may recover damages against the Sheriff, each Plaintiff's recovery will be limited to the amount of the bond. See Morgan v. Spivey, No. 5:16-CV-365-FL, 2019 WL 81480, at *22-23 (E.D.N.C. Jan. 2, 2019) (collecting cases).

### D. Plaintiff Hyatt's Motion for Partial Summary Judgment

Plaintiff Hyatt moves for Partial Summary Judgment. [Doc. 66]. As discussed above, there are genuine issues of material fact regarding the traffic stop of Plaintiff Hyatt and the events that followed. Accordingly, the Court concludes that Plaintiff Hyatt's Motion for Summary Judgment must be denied.

## V. CONCLUSION

For all these reasons, the Deputy Defendants' Motion for Summary Judgment, Defendant Miller and Western Surety Company's Motion for Judgment on the Pleadings, and Defendant Miller and Western Surety Company's Motion for Judgment on the Pleadings Motion for Summary Judgment will be granted in part and denied in part. Plaintiff Hyatt's Motion for Partial Summary Judgment will be denied.

# O R D E R

**IT IS, THEREFORE, ORDERED** that the Deputy Defendants' Motion for Summary Judgment [Doc. 78] is hereby **GRANTED IN PART** and **DENIED IN PART** as follows:

(1)    The Deputy Defendants' Motion is **GRANTED** with respect to Plaintiff Hyatt's false imprisonment and false arrest claims against the Deputy Defendants in their official capacities; (2) Plaintiff Hyatt's assault and battery claims against the Deputy Defendants in their official capacities; (3) Plaintiff Barrett's false imprisonment and false arrest claims against Defendants Lambert and Lewis in their official capacities; (4) Plaintiff Barrett's trespass to property claims against Defendants Lambert and Lewis in their individual and official capacities; and (5) Plaintiff Barrett's claims for unlawful search in violation of the Fourth Amendment against Defendants Lambert and Lewis in their individual capacities.

(2)    The Deputy Defendants' Motion is **DENIED** with respect to (1) Plaintiff Hyatt's false imprisonment and false arrest claims against the Deputy Defendants in their individual capacities; (2) Plaintiff Hyatt's assault and battery claims against the Deputy

Defendants in their individual capacities; (3) Plaintiff Hyatt's claim for unreasonable sexually invasive search in violation of the Fourth Amendment against Defendants May and Lambert in their individual capacities; (4) Plaintiff Hyatt's claim for unlawful seizure in violation of the Fourth Amendment against the Deputy Defendants in their individual capacities; (5) Plaintiff Hyatt's claim for unlawful search in violation of the Fourth Amendment against the Deputy Defendants in their individual capacities; (6) Plaintiff Barrett's false imprisonment and false arrest claims against Defendants Lambert and Lewis in their individual capacities; (7) Plaintiff Barrett's claim for unlawful seizure in violation of the Fourth Amendment against Defendants Lambert and Lewis in their individual capacities; and (8) Plaintiffs Hyatt and Barrett's claim for action under the bond against Defendant Miller and Defendant Western Surety Company.

**IT IS FURTHER ORDERED** that Defendant Miller and Western Surety Company's Motion for Judgment on the Pleadings [Doc. 74] and Motion for Summary Judgment [Doc. 75] are **GRANTED** to the extent that the Third Amended Complaint brings any claims under § 1983 or seeks to recover in

excess of the bond provided by Defendant Western Surety Company. Those

Motions are otherwise **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Hyatt's Motion for Partial

Summary Judgment [Doc. 66] is **DENIED**.

**IT IS SO ORDERED**.

Signed: February 12, 2021

Martin Reidinger
Chief United States District Judge

58