# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:19-cv-00250-MR-WCM

| | | |
|---|---|---|
| **MARCUS HYATT and ASHLEY BARRETT,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **QUENTIN MILLER, in his official** | ) | **MEMORANDUM OF** |
| **capacity as Buncombe County** | ) | **DECISION AND ORDER** |
| **Sheriff; WESTERN SURETY** | ) | |
| **COMPANY; J.D. LAMBERT,** | ) | |
| **individually and officially; JEFF MAY,** | ) | |
| **individually and officially; and** | ) | |
| **KATHERINE LEWIS, individually and** | ) | |
| **officially,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

THIS MATTER is before the Court following a jury trial. The jury was able to reach a verdict as to several issues presented to it, but deadlocked as to others. The parties then stipulated that the Court could sit as a finder of fact and resolve those issues upon which the jury deadlocked, taking into account how the jury had resolved the issues on which it had reached a unanimous verdict. Based thereon, the Court enters this Memorandum of Decision.

## I.    BACKGROUND

On January 20, 2018, officers from the Buncombe County Sheriff's Office ("BCSO"), acting on a tip, conducted a traffic stop of a car driven by Brandon Pickens in which the Plaintiff Marcus Hyatt was a passenger. Plaintiff Hyatt was detained for the next several hours while officers searched the car and its occupants for illegal narcotics. After completing the search of the car, the officers procured a search warrant and conducted a strip search of Plaintiff Hyatt in a nearby convenience store bathroom. Ultimately, Plaintiff Hyatt was not found to be in possession of any controlled substances, and he was released without charges.

At the same time that Plaintiff Hyatt was being detained, his girlfriend, Plaintiff Ashley Barrett, was stopped by BCSO officers in a separate traffic stop on suspicion that she was attempting to dispose of controlled substances at the couple's apartment. Following a search of Plaintiff Barrett's vehicle and the couple's apartment, no controlled substances were found, and Plaintiff Barrett was also released without charges.

The Plaintiffs then brought this action pursuant to 42 U.S.C. § 1983 and North Carolina state law, challenging the officers' actions during the respective traffic stops and searches. Specifically, Plaintiff Hyatt asserted claims for false imprisonment, false arrest, and assault and battery under

2

state law and for unlawful search and seizure in violation of the Fourth Amendment under 42 U.S.C. § 1983 against BCSO deputies J.D. Lambert, Jeff May, and Katherine Lewis. Plaintiff Hyatt also asserted a claim for unreasonable sexually invasive search in violation of the Fourth Amendment under § 1983 against Defendants Lambert and May. Plaintiff Barrett asserted claims for false imprisonment and false arrest under state law and for unlawful seizure in violation of the Fourth Amendment under §1983 against Defendants Lambert and Lewis. The Plaintiffs also asserted a claim for action under the bond against Defendant Miller and Defendant Western Surety Company.[1]

From March 17, 2021 to March 25, 2021, the Court held a jury trial in this matter. The following issues were submitted to the jury, and the jury unanimously returned their verdict thereon as follows:

> 1. Did Defendant Lambert see Brandon Pickens' vehicle change lanes without signaling and affect the operation of another vehicle?
>
> Answer: YES

---

[1] Ms. Barrett also asserted state law claims for trespass to property and § 1983 claims for unlawful search, but these claims were dismissed on summary judgment. [Doc. 99]. The Plaintiffs' § 1983 claims against the Defendants in their official capacities were dismissed as well. [Id.].

2.      Did Defendant Lambert have reasonable suspicion to stop Brandon Pickens' vehicle?

        Answer:  YES

3.      Did Defendant Lambert's canine alert to Brandon Pickens' vehicle?

        Answer:  YES

4.      Did Defendant Lambert nonetheless actually believe that his canine alerted?

        Answer:    No response[2]

5.      Did Defendant May smell crack cocaine on Plaintiff Hyatt?

        Answer:  NO

6.      Did Defendant May find a substance in Brandon Pickens' vehicle that produced a positive field test result for cocaine?

        Answer:  NO

7.      Was the strip search of Plaintiff Hyatt conducted without the display of a dangerous weapon?

        As to Defendant Lambert:    YES

        As to Defendant May:        NO

8.      Was the conduct of the strip search by Defendant Lambert and/or Defendant May reasonable under the Fourth Amendment?

---

[2] Issue No. 4 was to be answered only in the event that the answer to Issue No. 3 was "no."  Because the jury answered Issue No. 3 in the affirmative, no answer to Issue No. 4 was necessary.

4

As to Defendant Lambert:     YES

As to Defendant May:          NO

9.     Did Plaintiff Barrett consent to stay with or go with Defendant Lambert and Defendant Lewis after she had obtained insurance for her vehicle?

Answer:     NO

[Doc. 132: First Verdict Sheet].

Based upon the jury's answers to these issues, the Court presented

the jury with a second Verdict Sheet containing Issue Nos. 10 through 17.

After further deliberation, the jury unanimously returned a verdict only as to

the following issues:

10.     Did Defendant Lambert have knowledge that Defendant May had not obtained a positive field test result or smelled crack cocaine on Plaintiff Hyatt before executing the search warrant?

Answer:     NO[3]

---

[3] Because the jury answered Issue No. 10 "no," they were not required to answer Issue No. 11, which asked the jury whether Defendant Lambert acted maliciously, corruptly, or outside the scope of his official authority (Issue No. 11.A.) or whether he acted within the course of his employment (Issue No. 11.B.). In light of the jury's response to Issue No. 10, the Court need not address the questions presented in Issue No. 11.

5

> 12.B.     Was [the strip search of Plaintiff Hyatt] by Defendant May performed within the course of his employment with the Buncombe County Sheriff's Office?
>
> Answer:     NO

[Doc. 134: Second Verdict Sheet].

With respect to Issue No. 13.A. and Issue No. 14 on the Second Verdict Sheet, the jury initially indicated that they had returned a unanimous verdict. These issues read as follows:

> 13.A.     Was [the strip search of Plaintiff Hyatt] by Defendant(s) a proximate cause of any injury to Plaintiff Hyatt?
>
> 14.     Did Defendants Lambert and Lewis have reasonable suspicion to detain Plaintiff Barrett after she obtained insurance for her car?

[Id.]. However, upon the pronouncement of verdict and polling of the jury, it was determined that such verdict was not unanimous among all the jurors. The jury again retired to the jury deliberation room to determine whether they had, in fact, reached a verdict as to these two issues. They ultimately returned to the courtroom to announce that they were deadlocked as to Issue No. 13.A. and Issue No. 14.

The jury was also unable to reach a verdict and deadlocked as to the following issues on the Second Verdict Sheet:

6

12.A.    Was [the strip search of Plaintiff Hyatt] by Defendant May malicious, corrupt, or outside the scope of his official authority?

13.B.    What amount of damages has Plaintiff Hyatt sustained as a result of the Defendants' conduct?

15.A.    Was [the detention of Plaintiff Barrett] by Defendant Lambert malicious, corrupt, or outside the scope of his official authority?

15.B.    Was [the detention of Plaintiff Barrett] by Defendant Lambert performed within the course of his employment with the Buncombe County Sheriff's Office?

16.A.    Was [the detention of Plaintiff Barrett] by Defendant Lewis malicious, corrupt, or outside the scope of her official authority?

16.B.    Was [the detention of Plaintiff Barrett] by Defendant Lewis performed within the course of her employment with the Buncombe County Sheriff's Office?

17.A.    Was [the search of Plaintiff Barrett] by Defendants a proximate cause of any injury to Plaintiff Barrett?

17.B.    What amount of damages has Plaintiff Barrett sustained as a result of the Defendants' conduct?

[Id.].

The parties stipulated and agreed that the Court could find the facts necessary to answer the issues on which the jury had deadlocked, without empaneling another jury and retrying those issues, and thereafter enter a

judgment based on the issues so resolved and as had been answered by the jury.[4]

## II. FINDINGS OF FACT[5]

### A. The Surveillance of Plaintiffs' Apartment

During the period relevant to this case, Plaintiffs Marcus Hyatt and Ashley Barrett (the "Plaintiffs") resided in an apartment at 696 North Morgan Branch Road in Candler, North Carolina (the "Apartment"). [Doc. 108: Joint Stipulation of Facts ("Jt. Stip.") at ¶ 1]. During the period relevant to this case, Defendants J.D. Lambert, Jeff May, and Katherine Lewis were employed as sworn deputies of the Buncombe County Sheriff's Office. [Id. at ¶ 2].

---

[4] See Bridges v. Chemrex Spec. Coatings, Inc., 704 F.2d 175, 180 (5th Cir. 1983) (holding that "a jury's failure to reach a verdict on every interrogatory does not prevent a court from accepting the properly-answered interrogatories . . . even if other claims in the case remain unsettled."); Kerman v. City of New York, 261 F.3d 229, 243 n.9 (2d Cir. 2001) (affirming trial court's acceptance of partial verdict, stating that "[i]n the absence of authority prohibiting such a partial verdict in a civil case . . . we believe that at the very least a trial judge, in the exercise of sound discretion, may follow such a course"); see also Jordan v. Large, 27 F.4th 308, 310 (4th Cir. 2022) (reinstating findings of partial jury verdict that was improperly invalidated by trial court due to deadlock on other issues presented to the jury).

[5] The Court's findings are based on the stipulations of fact submitted by the parties, the jury's findings, the Court's notes from the trial, and a preliminary transcript. No final transcript has yet been ordered or prepared due to the court reporter's extended illness and untimely death.

Sometime before January 20, 2018, an individual[6] contacted the Buncombe County Sheriff's Office and spoke to Defendant May to report heavy vehicle and foot traffic at the Apartment. Defendant May travelled to the Apartment and observed several different vehicles outside the Apartment, which is located above an automobile repair garage.

On January 20, 2018, the individual contacted Defendant May and notified him that a new vehicle was at the Apartment. Defendant May discovered that the vehicle was registered to Brandon Pickens, who had a criminal record that included drug trafficking convictions.

### B. The Traffic Stop of Plaintiff Hyatt

Around 12:00 p.m. on January 20, 2018, Defendants Lambert and May drove to the Apartment to conduct surveillance. Defendants Lambert and May observed two individuals (later identified as Brandon Pickens and Plaintiff Hyatt) leaving the Apartment and driving away in the vehicle. [Doc. 108: Jt. Stip. at ¶ 3]. Defendant May followed that vehicle down Smokey Park Highway in his marked patrol vehicle. [Id. at ¶¶ 4-5]. Defendant Lambert also followed that vehicle in his unmarked patrol vehicle, which had his police canine in the back seat. [Id.]. When Defendant May's marked

---

[6] Although this individual is not identified in the record, Defendant May knew the person's identity.

patrol vehicle got close to the vehicle, the driver applied the brakes. Defendant May stopped following the vehicle and told Defendant Lambert to continue following the vehicle in his unmarked patrol vehicle.

Defendant Lambert observed the vehicle change lanes without signaling and affect the operation of another vehicle. [Doc. 132: First Verdict Sheet at 2]. Defendant Lambert initiated a traffic stop at the Fastop Food Mart located at 627 Smokey Park Highway. [Doc. 108: Jt. Stip. at ¶ 6]. Defendants May and Lewis joined Defendant Lambert at the traffic stop shortly thereafter. [Id.at ¶ 7]. Defendant Lambert approached the vehicle and saw the driver, Brandon Pickens, move his right hand below his leg. Defendant Lambert removed Pickens from the vehicle to conduct a frisk for weapons. Defendant May removed Plaintiff Hyatt from the vehicle and conducted a frisk of Plaintiff Hyatt, including a search of his pant pockets. [Id. at ¶ 10]. During this search of Plaintiff Hyatt, Defendant May found roughly $1,500 in $20 bills in his pockets.

Defendant May stated to Defendant Lambert that he smelled the odor of cooked crack cocaine on Plaintiff Hyatt. At trial, Defendant May testified that cooked crack cocaine has a distinctive odor, and that he was certain that the odor on Plaintiff Hyatt was cooked crack cocaine. No other individual at the traffic stop, however, said that they smelled the odor of cooked crack

cocaine. [Id. at ¶ 12]. The jury found that Defendant May did not, in fact, smell crack cocaine on Plaintiff Hyatt. [Doc. 132: First Verdict Sheet at 3]. As such, Defendant May's statement was an attempt to fabricate an element of probable cause.

Defendant Lambert used his narcotics detection canine to conduct a free air sniff for the scent of drugs around the outside of the vehicle. [Doc. 108: Jt. Stip. at ¶ 13]. As the jury found, Defendant Lambert's canine alerted to the outside of Brandon Pickens' vehicle. [Doc. 132: First Verdict Sheet at 2]. Defendant Lambert then used his canine to search the inside of the vehicle. [Doc. 108: Jt. Stip. at ¶ 16]. Defendant Lambert's canine alerted to the inside of the vehicle, specifically to an open black pouch on the passenger-side floorboard.

At some point, Defendant May claimed to find a substance in the vehicle that produced a positive result for cocaine on a field test. Although Defendant May and several other officers were wearing body cameras, no body camera captured the discovery of any substance, what any such substance may have looked like, or the test of such substance.[7] The residue

---

[7] The Defendants and other officers on the scene used their body cameras only sporadically throughout the traffic stop. The cameras were switched on and off multiple times during the stop or, in the case of Defendant Lewis, were covered by clothing.

11

of such material was not preserved as evidence, nor was the field test kit that Defendant May purportedly used. As found by the jury, Defendant May's claim that he found a substance in the vehicle that produced a positive field test result for cocaine was false. [Doc. 132: First Verdict Sheet at 3].

Defendant Lambert asked Plaintiff Hyatt if he would voluntarily consent to a strip search, but Plaintiff Hyatt declined. At 1:12 p.m., approximately 45 minutes into this traffic stop, Defendant Lambert told Brandon Pickens that the officers were going to apply for a search warrant and would detain Plaintiff Hyatt and Brandon Pickens while the application was pending. [Plaintiffs' Ex. 12: Video at 13:12].

Defendant May contacted Officer Steven Hendricks with the Asheville Police Department and provided him with the following information to put in

---

Additionally, when the body cameras were utilized, they often failed to clearly show the circumstances which the deputies claimed to create probable cause. For example, although Defendant Lambert's body camera was on during the canine sniff, the footage only rarely shows the dog because Defendant Lambert was not facing the car. At trial, defense counsel had to use two freeze frames from the video in order to show the dog's alert.

This case illustrates the necessity of the proper use of body cameras, both for the protection of the public and of law enforcement. Had the Defendants' body cameras been used properly, the jury would have had a clearer picture of what actually transpired during the traffic stop. Instead, the jury was left to resolve many of the controverted issues— such as whether the field test of the substance found in the vehicle actually tested positive for cocaine—based upon the conflicting testimony of the parties. Such issues could have been easily resolved (or would never have arisen) had the Defendants properly documented their activities with the cameras provided to them.

12

an application for a search warrant for Plaintiff Hyatt: Defendant May received a tip from a concerned citizen of increased foot and vehicle traffic at the Apartment; Defendant May had been by the Apartment on different occasions and noticed different vehicles at the Apartment, including Brandon Pickens' vehicle; Brandon Pickens had several prior drug charges and convictions; Plaintiff Hyatt had a single prior drug charge; Defendant Lambert's canine alerted to the driver's door handle, the passenger door seal, and the inside of the vehicle; Defendant May found a substance in Brandon Pickens' vehicle that produced a positive field test result for cocaine; Plaintiff Hyatt had a "large amount" of U.S. Currency on his person; and Defendant May smelled the odor he knows to be crack cocaine emanating from Plaintiff Hyatt's person. [Doc. 108: Jt. Stip. at ¶¶ 21-22; Plaintiffs' Ex. 5: Warrant at 5-6].

Officer Hendricks presented the application to Buncombe County Magistrate Christopher Matthew, who issued a search warrant for Plaintiff Hyatt's "person" at 3:32 p.m. [Doc. 108: Jt. Stip. at ¶¶ 24-25]. This was now some three hours into the traffic stop. Officer Hendricks immediately telephoned Defendant May and informed him that the search warrant for Plaintiff Hyatt had been issued. [Id. at ¶ 26].

Defendants Lambert and May escorted Plaintiff Hyatt handcuffed across the parking lot, through the convenience store in the presence of several store customers, walked him into the men's restroom, and locked the door. [Id. at ¶ 27]. As the jury found, Defendant May unholstered and held either a taser or a firearm during the strip search.[8] [Doc. 132: First Verdict Sheet at 4]. Defendants Lambert and May instructed Plaintiff Hyatt to disrobe, bend over and cough, display his rectum, and lift his testicles. Plaintiff Hyatt was afraid that the officers might assault him or plant something on him in the bathroom. The search produced no drugs or evidence of criminal activity. [Id. at ¶ 28]. Plaintiff Hyatt was detained from approximately 12:30 p.m. to approximately 4:00 p.m. [Id. at ¶ 8].

The jury found that Defendant Lambert did not know that Defendant May's claims about the smell of crack cocaine and the positive field test were false. [Doc. 134: Second Verdict Sheet at 2]. The jury further found that Defendant May's conduct during the Hyatt traffic stop was outside the course of his employment with the Buncombe County Sheriff's Office. [Id. at 4].

---

[8] At the close of the Plaintiff's evidence, and again in their post-trial filings in support of their proposed judgment [Docs. 138, 138-1], the Defendants argued that there was insufficient evidence presented to support the jury's finding that Defendant May displayed any kind of weapon during the search. Upon reviewing the testimony presented at trial, however, the Court finds there was a sufficient evidentiary basis for the jury's finding that Defendant May displayed a weapon during the search of Plaintiff Hyatt.

## C. The Traffic Stop of Plaintiff Barrett

During the traffic stop of Brandon Pickens and Plaintiff Hyatt, Defendant Lewis saw Plaintiff Hyatt "viciously texting," which she considered suspicious. Defendant Lewis left the Hyatt traffic stop to continue the surveillance of the Apartment. [Doc. 108: Jt. Stip. at ¶ 34]. While surveilling the Apartment, Defendant Lewis saw an individual, later identified as Plaintiff Barrett, park a vehicle outside the Apartment and go inside. [Id. at ¶ 35]. Defendant Lewis ran the license plate tag on the vehicle and discovered that the vehicle was registered to Plaintiff Barrett and had a revoked tag, learning later that the revocation was due to lapsed insurance. [Id. at ¶ 36].

Defendant Lewis watched Plaintiff Barrett leave the Apartment after a brief period, get into the same vehicle, and drive away. [Id. at ¶ 37]. Defendant Lewis followed the vehicle and initiated a traffic stop of Plaintiff Barrett at approximately 3:41 p.m. for the lapsed insurance. [Id. at ¶ 38].

Defendant Lewis suspected that Plaintiff Barrett was engaged in criminal activity when she initiated the traffic stop. At that time, Defendant Lewis knew that a concerned citizen had complained about unusual foot and vehicle traffic at Plaintiff Barrett's apartment, which led Defendant Lewis to believe that the Apartment was being used for drug trafficking. By that time, Defendant Lewis also knew that the officers had been unable to discover any

15

drugs in Brandon Pickens' vehicle that had just left the Apartment, despite the dog alert to the vehicle. Defendant Lewis testified that after seeing Plaintiff Hyatt "viciously texting" during the traffic stop and seeing Plaintiff Barrett return to the Apartment and quickly leave, she suspected that Plaintiff Hyatt had texted Plaintiff Barrett to return to the Apartment to conceal, remove, or destroy contraband. Defendant Lewis also observed that Plaintiff Barrett was extremely nervous and shaking during the traffic stop, despite the fact that Defendant Lewis was being very personable and not overbearing.

Plaintiff Barrett gave Defendant Lewis consent to search her vehicle while she attempted to obtain insurance over the telephone. Defendant Lewis did not find any narcotics or evidence of criminal activity in Plaintiff Barrett's vehicle. At approximately 3:59 p.m., Plaintiff Barrett obtained insurance on her vehicle over the phone. [Id. at ¶ 40]. At approximately the same time, Defendant Lambert arrived at the scene of the traffic stop. [Id. at ¶ 41].

Defendants Lambert and Lewis asked Plaintiff Barrett if she would consent to a search of the Apartment. [Id. at ¶ 42]. Plaintiff Barrett disavowed responsibility for the contents of the Apartment, claiming that she did not know who had been there. Plaintiff Barrett asked Defendants

Lambert and Lewis if they were going to arrest her and Defendant Lambert said "we're not going to arrest you, we may detain you, but we're not going to arrest you because you say no."  [Id. at ¶ 43].

Defendant Lambert told Plaintiff Barrett that Defendant Lewis "is going to tell you in just a second that you're free to leave" and that it was her choice whether they could search the Apartment.  [Id. at ¶ 44].  Plaintiff Barrett followed Defendants Lewis and Lambert back to the Apartment in her vehicle.  [Doc. 108: Jt. Stip. at ¶ 45].  The jury found, however, that Plaintiff Barrett did not consent to go back to the Apartment with Defendant Lambert and Lewis after obtaining insurance for her vehicle,  [Doc. 132: First Verdict Sheet at 5], thus deeming Plaintiff Barrett's cooperation to that point to have been coerced.  At the Apartment, however, Plaintiff Barrett ultimately signed a document consenting to a search of the Apartment.  [Id. at ¶ 46].

### D. The Court's Factual Findings as to Plaintiff Hyatt's Claims

The jury answered every issue regarding Plaintiff Hyatt's claims except those issues pertaining to causation and damages.  Specifically, the jury found that Defendant Lambert observed the vehicle change lanes without signaling and affect the operation of another vehicle; that Defendant Lambert had reasonable suspicion to stop the vehicle; that the canine alerted to the vehicle; that Defendant May had made false statements, both about the

17

smell of crack cocaine and the presence of a substance that tested positive for cocaine, in order to obtain a warrant for the strip search, but that Defendant Lambert did not know that these statements were not true; that Defendant May displayed a dangerous weapon during the strip search of Plaintiff Hyatt, while Defendant Lambert did not; and that while Defendant Lambert conducted the strip search reasonably under the Fourth Amendment, Defendant May did not. The jury also found that Defendant May's conduct was not performed within the course of his employment with the Buncombe County Sheriff's Office.

In light of these findings, and based on the evidence presented at trial, the Court finds that the Defendants were at all times acting under color of state law with respect to their conduct toward Plaintiff Hyatt. The Court further makes the following findings of fact with respect to Issue Nos. 12.A., 13.A., and 13.B, which were not answered by the jury.

### 12.A.    *Was [the strip search of Plaintiff Hyatt] by Defendant May malicious, corrupt, or outside the scope of his official authority?*

In Issue 12.B., the jury found that Defendant May's actions in conducting the strip search of Plaintiff Hyatt were not performed within the course of his employment with the Buncombe County Sheriff's Office. They

left unanswered whether Defendant May's actions were also outside the scope of his official authority.

The "scope of official authority" defines what a law enforcement officer can lawfully do, while the "course of employment" includes that which an officer is ordered or directed to do, even if such action is unlawful (such as following an unlawful policy). It is possible for one to act "*within* the *course* of employment" (i.e., pursuant to orders or training as provided by one's superiors), but also "*outside* the *scope* of official authority" (i.e., if such orders or training direct an officer to perform an act that is outside the scope of his or her official duty). However, an act performed "*outside* the *course* of employment" necessarily is also an act "*outside* the *scope* of official authority."

Here, the jury found that Defendant May acted outside the course of his employment. Although he was in uniform and technically on duty (and thus under color of law), Defendant May obtained a warrant to conduct a strip search of a citizen based on information he knew to be false, and he conducted that search while displaying a weapon. In short, the jury found Defendant May to have "gone rogue." Such actions by Defendant May are both outside the course of his employment and outside the scope of his official authority, and the Court so finds.

### 13.A.  Was [the strip search of Plaintiff Hyatt] by Defendant(s) a proximate cause of any injury to Plaintiff Hyatt?

It is uncontroverted that the actions of Defendant May resulted in the strip search of Plaintiff Hyatt. Defendant May claimed that those actions were entirely legitimate and lawful, but the jury found otherwise.[9] Therefore, the only remaining determination to be made regarding proximate cause is whether Plaintiff Hyatt suffered an injury.

It is axiomatic that "[a] § 1983 action, like its state tort analogs, employs the principle of proximate causation." Townes v. City of New York, 176 F.3d 138, 146 (2d Cir. 1999) (citations omitted). As such, "the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury." Gierlinger v. Gleason, 160 F.3d 858, 872 (2d Cir. 1998). "To establish the

---

[9] In his post-trial filings, Defendant May now claims that his display of the weapon was "appropriate to maintain the status quo, prevent escape from custody, and protect officer safety." [Doc. 138-1 at 16 (citing State v. Carrouthers, 200 N.C. App. 415, 419, 683 S.E.2d 781, 784 (2009))]. Drawing a weapon on a suspect "is an extraordinary measure" that must be justified "as a reasonable means of neutralizing potential dangers to police and innocent bystanders." United States v. Sinclair, 983 F.2d 598, 602 (4th Cir. 1993) (brackets omitted). In this case, however, Plaintiff Hyatt posed little threat to the officers' safety during the strip search. When Defendant May displayed the weapon, Plaintiff Hyatt was secured by Defendant Lambert and Defendant May in a small bathroom. Plaintiff Hyatt was handcuffed for at least some of the time when the weapon was displayed and had shown no prior indication that he was a threat to the officers' safety. Moreover, Defendant May knew that Plaintiff Hyatt had no weapons because he had voluntarily consented to a search of his pockets, and the officers had searched and frisked him multiple times without finding any weapons. Likewise, there was little chance that Plaintiff Hyatt was planning (or even able) to escape from a locked bathroom with two officers inside and several more officers in the parking lot, particularly considering that Plaintiff Hyatt was required to remove all his clothing.

20

necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the [defendant's action] and the specific deprivation of constitutional rights at issue." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (citation omitted).

Defendant May argues that his statements could not have been the proximate cause for Plaintiff Hyatt's seizure because, in Defendant May's view, the jury found that Defendant "Lambert had an independently lawful basis to conduct the very same seizure of which Hyatt complains." [Doc. 140: Defendants' Response in Opposition to Plaintiffs' Trial Brief at 7].[10]  As the Fourth Circuit has explained, however, "a reasonable officer cannot believe a warrant is supported by probable cause if the magistrate is misled by statements that the officer knows or should know are false." Smith v. Reddy, 101 F.3d 351, 355 (4th Cir. 1996).  Moreover, the fact that the magistrate issued the warrant did not break the "causal chain between the application for the warrant and the improvident arrest." Malley v. Briggs, 475 U.S. 335, 344-45 n. 7 (1986).  Because Defendant May knew that the application

---

[10] As discussed above, the jury was never asked whether Defendant Lambert had a lawful basis for the strip search.  Moreover, Defendant Lambert had a much different basis for conducting the strip search than Defendant May because (as the jury found) he believed Defendant May's false statements to be true and apparently had no reason to doubt the validity of the warrant.

contained false statements, he cannot rely on the warrant, or another officer's reliance on such warrant, as a shield for his wrongful conduct.

Moreover, as is discussed in detail in the Conclusions of Law, *infra*, the remaining truthful statements in the application were insufficient to demonstrate probable cause to conduct a visual body cavity search of Plaintiff Hyatt. As such, the search would not have occurred absent those false statements from Defendant May. Accordingly, the Court finds and concludes that Defendant May's false statements were the proximate cause of the unconstitutional visual body cavity search.

The Court now turns to the issue of whether Plaintiff Hyatt suffered an injury as a result of Defendant May's actions. A plaintiff can prove actual damages under § 1983 even without demonstrating a physical injury. Gray v. Spillman, 925 F.2d 90, 94 (4th Cir. 1991) (citing Memphis Community School Dist. v. Stachura, 477 U.S. 299, 308 n. 11 (1986)). As such, compensatory damages under § 1983 may be based on "personal humiliation" and "mental anguish and suffering." Id.

Here, Plaintiff Hyatt was escorted, handcuffed, through a parking lot and into a public convenience store by two uniformed officers. He was brought inside the men's restroom, and the door was locked behind them. Once in the restroom, Plaintiff Hyatt was ordered to strip naked, expose his

most private areas to the officers, and even manipulate his genitals in order for the officers to complete their inspection. The Court specifically finds that this sort of extreme humiliation, both public and private, constitutes an injury. See Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1272 (7th Cir. 1983) (noting that visual inspection of genital and anal areas during strip search is "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, [and] signifying degradation and submission") (citation omitted)). It is an injury proximately caused by the conduct of Defendant May, which conduct the jury found to be wrongful. Moreover, the displaying of a weapon (whether that was a taser or a firearm) by Defendant May during this extremely invasive strip search in a cramped public restroom caused Plaintiff Hyatt to experience fear and anxiety and further added to his feelings of humiliation and degradation.

Furthermore, Plaintiff Hyatt's fear that something may be planted on him, or in his pockets once his clothing was removed, was a legitimate fear. After all, Plaintiff Hyatt had been detained for approximately three hours by this point, with the officers finding no illegal substances or items during multiple searches. Further, Defendant May had already made false statements regarding the smell of crack cocaine and finding a substance in the vehicle that tested positive for cocaine. Under these circumstances,

23

Plaintiff Hyatt's fear that Defendant May would fabricate further evidence against him was completely justified. For these reasons, the Court finds as fact that the wrongful conduct of Defendant May as found by the jury was a proximate cause of an injury to Plaintiff Hyatt.

### 13.B.     *What amount of damages has Plaintiff Hyatt sustained as a result of the Defendants' conduct?*

Based on Defendant May's unlawful search and seizure, the humiliation and degradation that Plaintiff Hyatt suffered as a result of the unreasonable strip search, and the fear and anxiety caused by Defendant May's actions in displaying a weapon and in fabricating evidence in order to obtain the search warrant, the Court finds that Defendant May is liable to Plaintiff Hyatt for damages in the amount of $50,000.

### E.     The Court's Factual Findings as to Plaintiff Barrett's Claims

The jury deadlocked as to more questions regarding Plaintiff Barrett. The jury found that Plaintiff Barrett did not consent to stay with or go with Defendant Lambert and Defendant Lewis after she had obtained insurance for her vehicle. The jury, however, was unable to reach unanimous agreement regarding the issues of whether Defendants Lambert and Lewis had reasonable suspicion to detain her after she obtained insurance for her car (Issue No. 14); whether the Defendants' detention of Plaintiff Barrett was

24

malicious, corrupt, or outside the scope of their respective authority (Issue No. 15.A. and Issue No. 16.A.); whether the Defendants' detention of Plaintiff Barrett was performed within the course of their respective employment with the Buncombe County Sheriff's Office (Issue No. 15.B. and Issue No. 16.B.); whether the Defendants' conduct was a proximate cause of any injury to Plaintiff Barrett (Issue No. 17.A.); and, if so, the amount of damages to which she is entitled (Issue No. 17.B.).

In light of the jury's findings, and based on the evidence presented at trial, the Court finds that the Defendants were at all times acting under color of state law with respect to their conduct toward Plaintiff Barrett. The Court further makes the following findings of fact regarding the detention of Plaintiff Barrett.

### 14. *Did Defendants Lambert and Lewis have reasonable suspicion to detain Plaintiff Barrett after she obtained insurance for her car?*

Although Plaintiff Barrett did not consent to being further detained after she had obtained insurance for her car (thereby resolving the issue which justified the traffic stop in the first place), the Court finds that Defendant Lambert and Lewis had reasonable suspicion to continue her detention in order to further her investigation.

An officer with reasonable suspicion has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Kansas v. Glover, — U.S. —, 140 S. Ct. 1183, 1187 (2020) (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Reasonable suspicion is a "commonsense, nontechnical" standard that relies on the judgment of experienced law enforcement officers, "not legal technicians." See Ornelas v. United States, 517 U.S. 690, 695 (1996) (citation and internal quotation marks omitted). To support a finding of reasonable suspicion, the detaining officer must "either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." See United States v. Foster, 634 F.3d 243, 248 (4th Cir. 2011). Accordingly, "an officer's articulated facts must in their totality serve to eliminate a substantial portion of innocent travelers before reasonable suspicion will exist." United States v. McCoy, 513 F.3d 405, 413 (4th Cir. 2008). Courts look to the totality of the circumstances in determining whether an officer had reasonable suspicion of criminal activity. United States v. Arvizu, 534 U.S. 266, 273 (2002). When considering the totality of the circumstances, the Court "must not overlook facts that tend to dispel

reasonable suspicion."  United States v. Drakeford, 992 F.3d 255, 258 (4th Cir. 2021).

Defendant Lewis suspected that Plaintiff Barrett was engaged in criminal activity when she initiated the traffic stop.  At that time, Defendant Lewis knew that a concerned citizen had complained about unusual foot and vehicle traffic at Plaintiff Barrett's apartment, which led her to a suspicion that the Apartment was being used for drug trafficking. Defendant Lewis also knew that the officers had been unable to discover any drugs in Brandon Pickens' vehicle that had just left the Apartment, despite the dog alert to the vehicle. Defendant Lewis observed Plaintiff Hyatt "texting viciously" at the scene of the Pickens' vehicle stop.  When she returned to the residence, Defendant Lewis saw confirmation of what she had suspected: a person arriving at the residence and quickly leaving—evidencing possible attempts to dispose of contraband, either by removing it or destroying it.  Either way, there was a reasonable belief that something criminal was afoot.  Defendant Lewis had probable cause to stop Plaintiff Barrett for the revoked tag, and that issue was ultimately resolved.  However, Defendant Lewis's suspicion that illicit drug activity was occurring was not dissipated by Plaintiff Barrett obtaining insurance or by anything else that Plaintiff Barrett did or said during

the traffic stop.[11]  Defendants Lambert and Lewis also relied on Plaintiff Barrett disavowing responsibility for the contents of the Apartment.  The deputies both testified that Plaintiff Barrett's response suggested that there may be drugs or other evidence of criminal activity in the Apartment.

For all these reasons, the Court finds that there was reasonable suspicion to detain Plaintiff Barrett even after she had obtained insurance, and that the Defendants then diligently pursued a means of investigation that was likely to confirm or dispel their suspicions by seeking consent to search Plaintiff Barrett's apartment.

In light of the Court's finding with respect to Issue No. 14, the Court need not address Issue Nos. 15.A., 15.B., 16.A., 16.B., 17.A. or 17.B.

## III.    CONCLUSIONS OF LAW

### A.    Plaintiff Hyatt's Federal Law Claims

Plaintiff Hyatt brings claims under 42 U.S.C. § 1983 against Defendants Lambert, Lewis, and May in their individual capacities for his unlawful seizure during the traffic stop and against Defendants Lambert and

---

[11] While the Defendants did not uncover any contraband in Plaintiff Barrett's car, this did not necessarily dissipate the officers' suspicion; in fact, it may have only increased their concern that Plaintiff Barrett had rushed back to the Apartment in order to dispose of or destroy contraband before the officers could access the residence.

May in their individual capacities for an unlawful search and an unreasonably sexually invasive search in violation of the Fourth Amendment.[12]  [Doc. 63: Third Am. Complaint at ¶¶ 57-84].

The Court will first address the scope of Plaintiff Hyatt's § 1983 claims. The jury determined that Defendant Lambert saw Brandon Pickens' vehicle change lanes without signaling and affect another vehicle.  [Doc. 132: First Verdict Sheet at 2].  As such, Defendant Lambert had probable cause to stop Brandon Pickens' vehicle for violating N.C. Gen. Stat. § 20-154(a), which prohibits affecting the operation of another vehicle when changing lanes without signaling.  Because the initial traffic stop was supported by probable cause, the Court concludes that Plaintiff Hyatt's claim for unreasonable seizure based on the initial traffic stop must be dismissed.  See United States v. Feliciana, 974 F.3d 519, 522 (4th Cir. 2020)

The Defendants needed probable cause or reasonable suspicion to continue Plaintiff Hyatt's detention beyond the time reasonably required to complete the traffic stop.  See United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008).  While the other deputies were writing a ticket for the traffic violation, Defendant Lambert used his canine to conduct a free air sniff.  That

---

[12] The Fourth Amendment applies to state officers through the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 654-55 (1961).

29

sniff was lawful because it occurred during the time "reasonably required" to issue the ticket for the traffic violation.  See Illinois v. Caballes, 543 U.S. 405, 407 (2005).  Because the dog alerted to Brandon Pickens' vehicle, [Doc. 132: First Verdict Sheet at 2], the deputies had probable cause to search the vehicle.  See Florida v. Harris, 568 U.S. 237, 247-48 (2013); Branch, 537 F.3d at 340 n.2 (4th Cir. 2008).  Accordingly, the deputies lawfully detained Plaintiff Hyatt while searching the vehicle.  See United States v. Smith, 704 F.2d 723, 725 (4th Cir. 1983) (noting that "[o]fficers searching a location have the authority to detain the occupants while a proper search is conducted") (citation omitted); United States v. Cantu, 405 F.3d 1173, 1179 (10th Cir. 2005) (explaining that officers with probable cause were justified in detaining a vehicle's driver while they sought a search warrant for a vehicle).  Therefore, Plaintiff Hyatt's § 1983 claims against Defendants Lambert, Lewis, and May based on the initial traffic stop and the search of the vehicle are dismissed.

Plaintiff Hyatt therefore has two remaining claims under § 1983.  First, Plaintiff Hyatt has claims for unlawful search and seizure arising from his detention and search pursuant to a warrant that was procured based on material false statements.  See Miller v. Prince George's Cty., 475 F.3d 621, 631 (4th Cir. 2007) ("[A] police officer violates the Fourth Amendment if, in

order to obtain a warrant, he deliberately or 'with reckless disregard for the truth' makes material false statements or omits material facts.") (quoting Franks v. Delaware, 438 U.S. 154, 155 (1978)).  Second, Plaintiff Hyatt has an unlawful search claim on the grounds that the strip search was conducted in an unreasonable manner.  See Bolden v. Village of Monticello, 344 F. Supp. 2d 407, 416 (S.D.N.Y. 2004) (noting that "[n]o search warrant shields a police officer from carrying out a search in an unreasonable manner").

### 1.    Unlawful Search and Seizure Claim

Plaintiff Hyatt's first claim challenges the lawfulness of his search and seizure based on the jury's finding that Defendant May provided false statements to obtain the warrant.  See Franks v. Delaware, 438 U.S. 154 (1978); United States v. Owens, 848 F.2d 462, 464 (4th Cir. 1988) (searches conducted pursuant to "a warrant issued on the basis of a deliberately false affidavit" violate the Fourth Amendment) (citing United States v. Leon, 468 U.S. 897, 923 (1984)); Miller, 475 F.3d at 627 (extending Franks to § 1983).

### a.    Merits of Unlawful Search and Seizure Claim

To establish a claim under Franks, Plaintiff Hyatt must show that the affiant included in the affidavit false statements that were made "knowingly and intentionally or with a reckless disregard for the truth," see Franks, 438 U.S. at 155-56, and that those false statements were "material," that is,

necessary to the finding of probable cause by a neutral and disinterested magistrate. Miller, 475 F.3d at 628 (internal quotation marks omitted); Evans v. Chalmers, 703 F.3d 636, 650 (4th Cir. 2012).

With regard to the first prong of Franks, the jury found that Defendant May never smelled cooked crack cocaine on Plaintiff Hyatt and that Defendant May never obtained a positive field test result for cocaine. [Doc. 132: First Verdict Sheet at 3].

While the warrant application included both of those statements, [Doc. 68-18: Warrant App. at 5-6], Defendant May argues that the jury's findings do not necessarily mean that those statements were false because the jury "was not asked any questions about [his] actual belief or whether he had an improper motive in making the statement[s]." [Doc. 140: Defendants' Trial Brief at 6]. According to Defendant May, the jury could have concluded that his statement about smelling cooked crack cocaine was not false because he was merely mistaken about the odor of cooked crack cocaine. [Id. at 5-6]. Defendant May, however, testified that cooked crack cocaine has a distinctive odor. Defendant May also testified that he was certain that the odor on Plaintiff Hyatt was cooked crack cocaine. Accordingly, the Court finds that Defendant May did not mistakenly believe that the "distinctive" odor of cooked crack cocaine was present when he told Officer Hendricks to

include that fact on the warrant application.  See State v. Arrington, 311 N.C. 633, 636, 319 S.E.2d 254, 256 (1984) (internal citations omitted) (explaining that "[t]he facts set forth in an affidavit for a search warrant must be such that a reasonably discreet and prudent person would rely upon them[.]").

Defendant May further argues that the jury's finding that he never obtained a positive field test result for cocaine could be construed as a mere finding that the field test was contaminated or unreliable.  [Doc. 140: Defendants' Trial Brief at 6].  That argument is meritless.  The jury was not asked if the substance was, in fact, cocaine.  The jury was asked: "Did Defendant May find a substance in Brandon Pickens' vehicle that produced a positive field test result for cocaine?"  [Doc. 132: First Verdict Sheet at 3]. As such, the jury considered only whether the field test returned a positive or negative result, not whether that test was contaminated or unreliable.  The jury's answer does not support the possibility that Defendant May obtained a "false" positive.  Indeed, if a false positive had occurred, the jury would have answered the question in the affirmative because the test would have returned as positive, regardless of any contamination or unreliability. Moreover, Defendant May was wearing a body camera, and its video did not show any substance that was supposedly found in the car, the presence of

any field test kit, the conduct of any such field test, the presence of a positive result, or any residual  substance.

Based on the jury's findings, the Court finds that Defendant May had Officer Hendricks include statements in the application for the search warrant that Defendant May knew to be false.  While there is no evidence that Officer Hendricks as the affiant personally knew or had reason to know that the statements were false, the Franks inquiry necessarily extends to government officials giving information to the actual affiant.  United States v. Whitley, 249 F.3d 614, 621 (7th Cir. 2001).  Otherwise, "police would be able to shield false information in affidavits from review simply by providing secondhand information to the drafting affiant."  United States v. Williams, 718 F.3d 644, 652 (7th Cir. 2013).  Accordingly, the Court concludes that the first prong of Franks is established by Defendant May's provision of false statements to Officer Hendricks regarding the odor of cooked crack cocaine and the existence of a positive field test for cocaine.

At the second prong of Franks, the Court must "excise the offending inaccuracies . . .  and then determine whether or not the corrected warrant affidavit would" provide adequate probable cause for the search.  Miller, 475 F.3d at 628 (internal quotation marks omitted).  Officers need only probable cause to conduct a strip search.  United States v. Ruffin, 979 F.3d 528, 532

34

(6th Cir. 2020) (explaining that "[t]he probable cause standard does not turn on the level of privacy interests associated with the place to be searched"). Nevertheless, probable cause to search a vehicle does not create probable cause to conduct a body search of that vehicle's passenger. <u>United States v. Di Re</u>, 332 U.S. 581, 587 (1948) (holding that a passenger's mere presence in a vehicle suspected to contain contraband does not create probable cause to search the suspect for contraband). Similarly, a person's mere proximity to people who are suspected of criminal activity, or presence in a location where a search has been authorized by warrant, does not give probable cause to search that person. <u>Ybarra v. Illinois</u>, 444 U.S. 85, 91 (1979). Instead, "a search or seizure of a person must be supported by probable cause particularized with respect to *that person*." <u>Id.</u> (emphasis added); <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983) (explaining that probable cause requires "a fair probability that contraband or evidence of a crime will be found *in a particular place.*") (emphasis in original).

Probable cause for a search warrant exists when "there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought constitute fruits, instrumentalities, or evidence of crime and will be present at the time and place of the search." <u>United States v. Suarez</u>, 906 F.2d 977, 984 (4th Cir.

1990).  To determine if an affidavit establishes probable cause, the Court must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [it], there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place." Gates, 462 U.S. at 238.  Review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the application for the search warrant.  United States v. Frazier, 423 F.3d 526, 535 (6th Cir. 2005).

After removing the false statements regarding the odor of cooked crack cocaine and the positive field test result, the remainder of the warrant application provided the magistrate with little in the way of probable cause. First, the application provided no detail about the reliability of the canine alert, which undercuts a finding of probable cause based solely on that fact.  See United States v. Adams, 971 F.3d 22, 32 (1st Cir. 2020) (stating that the "affidavit submitted in support of a warrant application must demonstrate probable cause in some trustworthy fashion") (citation and internal quotation marks omitted); United States v. Ludwig, 10 F.3d 1523, 1528 (10th Cir. 1993) (explaining that the trustworthiness of a drug dog's alert is particularly important because "a dog alert might not give probable cause if the particular dog had a poor accuracy record").

36

Second, the application mentioned that Defendant May received a "tip from a concerned citizen of increased foot and vehicle traffic at 690 [sic] North Morgan Branch [Road]." [Plaintiff's Ex. 5 at 5].[13] The "tip" detailed in the affidavit provides little indication of drug trafficking, such as the identity of any visitors, the length of the visits, or the presence of a drug odor. See United States v. Velazco-Durazo, 372 F. Supp. 2d 520, 529 (D. Ariz. 2005). The presence of increased foot and vehicle traffic at an apartment that is above an auto repair shop provides little basis to suspect that criminal activity is afoot. Moreover, although the affidavit states that that Defendant May had "noticed different vehicles at the residence[,]" Defendant May's observation did not necessarily corroborate the existence of "increased foot and vehicle traffic" at the residence. [Id.]. Notably, the affidavit did not describe the level of traffic at the Apartment. Moreover, the affidavit did not describe any indications of criminal activity observed by Defendant May during his surveillance. Further, the affidavit provided no information to the magistrate about the "concerned citizen" who provided the tip. As the Fourth Circuit has explained, affidavits based on unnamed informants, which provide "no indication of that informant's truthfulness or reliability[,]" are insufficient to

---

[13] The address listed in the application was incorrect, as Plaintiff Hyatt's Apartment was located at 696 North Morgan Branch Road.

37

establish probable cause.  United States v. Wilhelm, 80 F.3d 116, 120 (4th Cir. 1996).

Third, the application detailed Plaintiff Hyatt's single conviction for "Solicit to Commit a Felony to wit Possession of Cocaine" in December 2010 and Brandon Pickens' history of drug crimes.  [Id.].  While criminal records may be relevant to the probable cause analysis, United States v. Bynum, 293 F.3d 192, 197-98 (4th Cir. 2002), "[a] history of prior criminal conduct, standing alone, will not give rise to probable cause to believe that an individual is currently in possession of contraband or evidence of crime.  To conclude otherwise, would be to hold that anyone with a prior criminal record could be searched at any time."  United States v. Linn, No. 93-5816, 1994 WL 399179, at *4 (4th Cir. Aug. 3, 1994) (citing Beck v. Ohio, 379 U.S. 89, 96-97 (1964)).  This is especially the case where, as here, the sole criminal conviction at issue occurred eight years prior.  United States v. $5,000.00 in U.S. Currency, 40 F.3d 846, 849-50 (6th Cir. 1994) (explaining that, in the civil forfeiture context, a conviction on "state drug charges more than six years earlier is of little import here; a man's debt to society cannot be of infinite duration").  Accordingly, Plaintiff Hyatt's single conviction, standing alone, cannot establish probable cause to conduct a visual body cavity search of his person.

38

Moreover, Brandon Pickens' criminal history provided little basis for conducting a visual body cavity search of Plaintiff Hyatt's person. United States v. Clark, 754 F.2d 789, 791 (8th Cir. 1985) (explaining that "mere association with a known or suspected criminal, or mere presence in that person's automobile, does not create probable cause") (citation omitted). Even when combined with the dog alert and the tip, the criminal histories of Plaintiff Hyatt and Brandon Pickens did not establish probable cause to conduct a visual body cavity search.

Finally, the application stated that Plaintiff Hyatt had "a large amount of U.S. Currency on his person." [Plaintiffs' Ex. 5 at 6]. The application did not provide the amount or denomination of the bills Plaintiff Hyatt was carrying.[14] While carrying "a large sum of cash is strong evidence of some relationship with illegal drugs," United States v. $67,220.00 in U.S. Currency, 957 F.2d 280, 285 (6th Cir. 1992) (civil forfeiture), "[t]he existence of any sum

---

[14] Defendant May testified at trial that Plaintiff Hyatt was carrying roughly $1,500. In the civil forfeiture context, courts have found that individuals carrying far greater amounts are not carrying a "large amount" of currency. United States v. $5,000, 40 F.3d 846, 850 (6th Cir. 1994) (explaining that between $15,000 and $20,000 "is hardly enough cash, standing alone, to provide more than a suspicion of illegal activity") (citation omitted); Gonzales v. City of Albuquerque, No. CIV O3-1150 BB/WDS, 2004 WL 7337508, at *3 (D.N.M. Oct. 27, 2004) (noting that $4,200 is not a large amount of currency). While the general statement that Plaintiff Hyatt was carrying "a large amount" of cash does not necessarily implicate Franks, such descriptions are capable of misleading a magistrate, who has no idea if a "large amount" of cash means hundreds, thousands, or hundreds of thousands of dollars.

of money, standing alone, is not enough to establish probable cause[.]" United States v. $506,231 in U.S. Currency, 125 F.3d 442, 452 (7th Cir. 1997) (civil forfeiture).  Moreover, the cash on Plaintiff Hyatt's person is of limited value to the probable cause inquiry, even when combined with the other circumstances.  The application does not state that the dog ever alerted to the cash Plaintiff Hyatt was carrying, and the cash in Plaintiff Hyatt's pocket provided little probable cause to suspect that his body cavities were the "particular place" that drugs would be found.  See Illinois v. Gates, 462 U.S. 213, 238 (1983)).  Accordingly, Plaintiff Hyatt's possession of a "large amount" of cash did not establish probable cause to conduct a visual body cavity search of his person, even when considered in the totality of the circumstances.

Considering all of the residual facts set forth in the search warrant together, the Court concludes that the totality of the circumstances did not establish probable cause to conduct a strip search of Plaintiff Hyatt.  As such, the Court must conclude that May's false statements regarding the odor of cooked crack cocaine and the positive field test result for cocaine were necessary to the magistrate's probable cause determination.  Accordingly, the second prong of Franks is met here.

Because Plaintiff Hyatt has met both prongs of <u>Franks</u>, the Court concludes that he has established that Defendant May committed a Fourth Amendment violation when he included material false statements in the warrant application for the search. The Court further finds and concludes, for the reasons previously stated, that Defendant May's actions were a proximate cause of an injury to Plaintiff Hyatt.

### b. Qualified Immunity

Defendant May asserts that even though the warrant application contained false statements, he is entitled to qualified immunity for conducting the search pursuant to the warrant. [Doc. 138-1: Defendants' Memo. in Support of Proposed Judgment at 19]. Courts engage in a two-pronged inquiry when determining if officers are entitled to qualified immunity. <u>Smith v. Ray</u>, 781 F.3d 95, 100 (4th Cir. 2015). The first prong asks whether the officer's conduct violated a federal right." <u>Id.</u> "The second prong of the qualified immunity inquiry asks whether the right was clearly established at the time the violation occurred such that a reasonable person would have known that his conduct was unconstitutional." <u>Id.</u> "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond

41

debate." Reichle v. Howards, 566 U.S. 658, 664 (2012) (internal quotation marks, citations, and brackets omitted).

As discussed above, the Court has concluded that Defendant May violated Plaintiff Hyatt's Fourth Amendment rights by detaining him and searching him pursuant to a warrant based on material false statements. At the time Defendant May made the statements, "it was clearly established that a police officer could not lawfully make intentionally or recklessly false material statements or omissions in order to obtain a warrant." See Miller, 475 F.3d at 631-32. As the Fourth Circuit has explained, the provision of material false statements in a warrant application is not protected by qualified immunity because "a reasonable officer cannot believe a warrant is supported by probable cause if the magistrate is misled by statements that the officer knows or should know are false." Smith, 101 F.3d at 355. Because Defendant May's conduct violated a constitutional right that was clearly established at the time, he is not entitled to qualified immunity as to this claim.

### c. Defendant Lambert

While Plaintiff Hyatt has established a claim against Defendant May for detaining him and searching him pursuant to a warrant that was based on false statements, the jury concluded that Defendant Lambert had no

42

knowledge of Defendant May's false statements. [Doc. 134: Second Verdict Sheet at 2]. As such, Defendant Lambert detained and searched Plaintiff Hyatt pursuant to a warrant that he believed was lawfully issued. Accordingly, there is no basis for concluding that Defendant Lambert violated Plaintiff Hyatt's Fourth Amendment rights by detaining him and searching him pursuant to the warrant. See United States v. Leon, 468 U.S. 897, 922-24 (1984) (explaining that the Fourth Amendment is not violated when an officer objectively and reasonably relies on a magistrate's warrant that is later found to be invalid); see also Davis v. D.C., 156 F. Supp. 3d 194, 202 (D.D.C. 2016) (dismissing § 1983 claims against officers without knowledge of false statements supporting warrant). The Plaintiff's § 1983 claim against Defendant Lambert for detaining and searching him pursuant to a warrant that was based on false statements is dismissed.[15]

## 2. Unreasonable Sexually Invasive Search

Plaintiff Hyatt's second § 1983 claim is for an unreasonable sexually invasive search.

---

[15] Because the Court has determined that there is no basis for concluding that Defendant Lambert violated Plaintiff Hyatt's Fourth Amendment rights by detaining him and searching him pursuant to the warrant, the Court further concludes that Defendant Lambert is entitled to qualified immunity with respect to Plaintiff Hyatt's claims based on the detention and search.

### a. Merits of Unreasonable Sexually Invasive Search Claim

Even if the warrant in this case had been valid, "[t]he manner in which a warrant is executed is always subject to judicial review to ensure that it does not traverse the general Fourth Amendment proscription against unreasonableness."  Hummel–Jones v. Strope, 25 F.3d 647, 650 (8th Cir. 1994).  As such, officers "are not shielded by the warrant from liability under 42 U.S.C. § 1983 if the warrant was executed in an unreasonable manner."  Galluccio v. Holmes, 724 F.2d 301, 304 (2d Cir. 1983).  Likewise, a search is unreasonable if it exceeds the scope of the warrant.[16]  See Buonocore v. Harris, 65 F.3d 347, 357-59 (4th Cir. 1995).

---

[16] The officers sought and obtained a warrant to search Plaintiff Hyatt's "person." [Plaintiff's Ex. 6].  While the North Carolina Court of Appeals has held that a search warrant for a suspect's "person" necessarily authorizes a strip search, State v. Johnson, 143 N.C. App. 307, 312. 547 S.E.2d 445, 449 (2001); State v. Thompson, No. COA18-1146, 2019 WL 3562365, at *3 (Aug. 6, 2019), several federal courts have disagreed, particularly with respect to visual body cavity searches like the one conducted in this case. See United States v. Nelson, 36 F.3d 758, 760 (8th Cir. 1994) ("[A] search warrant for appellant's 'person' was not sufficient to authorize a body cavity search."); Valentine v. Brown, No. 8:18CV131, 2017 WL 11485519, at *4 (D. Neb. June 28, 2017) (explaining that "a warrant to search an individual's 'person' is not sufficient to authorize a visual body cavity search") (citation omitted); Bolden v. Village Of Monticello, 344 F. Supp. 2d 407, 416 (S.D.N.Y. 2004) ("[I]t is clear that the existence of a warrant authorizing the search of a person or persons, without more, does not justify the extraordinary invasion of privacy caused by a strip search, let alone a visual or invasive body cavity search."); Brown v.

44

"When . . . a search involves movement of clothing to facilitate the visual inspection of a person's naked body, the search qualifies as a type of sexually invasive search."  Sims v. Labowitz, 885 F.3d 254, 261 (4th Cir. 2018) (quoting United States v. Edwards, 666 F.3d 877, 882-83 (4th Cir. 2011) (citations, internal quotation marks, and brackets omitted).  To determine the reasonableness of a sexually invasive search, courts balance the need for the search against the invasion of personal rights caused by the search considering: (1) the place in which the search was conducted; (2) the scope of the particular intrusion; (3) the manner in which the search was conducted; and (4) the justification for initiating the search.  Bell v. Wolfish, 441 U.S. 520, 559 (1979).

Here, after considering the Bell factors, the jury found that Defendant Lambert conducted the strip search reasonably and Defendant May conducted the strip search unreasonably.  [Doc. 132: First Verdict Sheet at 4].  Citing no authority, Defendant May argues that because one of the Bell factors evaluates the justification for conducting the search, the jury

_____

City of Utica, No. 6:17cv01190 (BKS/ATB), 2020 WL 1046022, at *9 (N.D.N.Y. Mar. 4, 2020) (same).  On the interpretation of the Fourth Amendment, these federal court cases control.  A law enforcement officer cannot rely on a state court of appeals case interpreting the Fourth Amendment if the federal courts disagree.  At least, a law enforcement officer does so at his peril.

necessarily found that Defendant Lambert's search was justified when it found that he had conducted the search reasonably. [Id.]. According to Defendant May, that means that *his* search was also justified, and any other determination would create an inconsistent verdict. [Id.].

Defendant Lambert and Defendant May, however, had different justifications for conducting the strip search. While Defendant Lambert had no knowledge of the falsity of Defendant May's claims and thus honestly believed that Defendant May had found cocaine in the vehicle and had smelled cocaine on Plaintiff Hyatt, Defendant May knew those things were not true. Defendant Lambert also believed that he was conducting the search pursuant to a lawfully issued warrant containing only true statements, which Defendant May could not have believed. Based on those differences, the jury apparently concluded that Defendant May had a weaker justification for conducting the strip search than Defendant Lambert and/or that the different justifications were the difference between Defendant Lambert's reasonable search and Defendant May's unreasonable search. Accordingly, the Court's review of the sufficiency of the warrant does not create the possibility of an inconsistent verdict.

Based on the jury's findings, as well as the Court's other findings as set forth above, the Court further finds and concludes that only Defendant

May's actions in conducting an unreasonable sexually invasive search were a proximate cause of an injury to Plaintiff Hyatt. The Plaintiff's claim against Defendant Lambert for an unreasonable sexually invasive search is dismissed.[17]

### b. Qualified Immunity

Having concluded that Defendant May conducted the strip search in a way that violated Plaintiff Hyatt's constitutional right to be free from an unreasonable sexually invasive search, the lone remaining question is whether such right was clearly established at the time. For the purpose of analyzing whether the Fourth Amendment violation was clearly established, the Court must go beyond the general "unreasonableness" of the search and determine the nature of the Fourth Amendment violation "at a high level of particularity." Edwards v. City of Goldsboro, 178 F.3d 231, 250–51 (4th Cir. 1999); see also Wilson v. Layne, 526 U.S. 603, 615 (1999) (explaining that "the right allegedly violated must be defined at the acceptable level of specificity"). Nevertheless, the exact conduct at issue "need not have been held unlawful for the law governing an officer's actions to be clearly

---

[17] Because the Court has determined that there is no basis for concluding that Defendant Lambert violated Plaintiff Hyatt's Fourth Amendment rights in the execution of the search, the Court further concludes that Defendant Lambert is entitled to qualified immunity with respect to Plaintiff Hyatt's unreasonable sexually invasive search claim.

established."  Amaechi v. West, 237 F.3d 356, 362 (4th Cir. 2001) (citing

Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

As discussed above, it would have been clear to a reasonable officer

at the time that conducting such an invasive search based on fabricated

evidence, accompanied by the fact that Plaintiff Hyatt did not pose "a threat,"

and was not "attempting to resist or evade detention" See Turmon v. Jordan,

405 F.3d 202, 208 (4th Cir. 2005), was beyond the scope of what the Fourth

Amendment allows.

Particularly as for the display of a weapon. the Fourth Circuit has made

clear that such may violate the Fourth Amendment in certain situations.  See

Bellotte v. Edwards, 629 F.3d 415, 426 (4th Cir. 2011) (explaining that the

trial court needed to resolve a factual dispute regarding whether a firearm

was in fact pointed at the suspect before qualified immunity could be

determined); see also Unus v. Kane, 565 F.3d 103, 118 (4th Cir. 2009)

(explaining that under particular circumstances, "officers were reasonably

entitled to believe that the drawing of weapons was necessary in order to

gain control of a fluid situation and ensure the safety of all involved").  The

Fourth Circuit has explained that "a strong show of force, coupled with the

threat to actually use it if necessary, is sometimes the safest way to ensure

that a potentially volatile situation does not erupt into physical violence."

48

Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988). However, "officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." Jones v. Buchanan, 325 F.3d 520, 532 (4th Cir. 2003). Accordingly, the use of "significant forms of force, whether 'from a gun, a baton, a taser, or other weapon, precludes an officer from receiving qualified immunity if the subject is unarmed and secured.'" Maney v. Garrison, 681 F. App'x 210, 220 (4th Cir. 2017) (quoting Meyers v. Baltimore Cty., 713 F.3d 723, 734–35 (4th Cir. 2013)). These cases clearly establish that an officer cannot use force when the suspect is not armed, fleeing, resisting, or posing a threat. Turmon, 405 F.3d at 207-08 (explaining that an officer was not entitled to qualified immunity for pointing a firearm at a suspect where there was no evidence that the suspect was a threat, resisting, or attempting to evade detention); see also Brown v. City of Golden Valley, 574 F.3d 491, 499 (8th Cir. 2009) (explaining that it "is clearly established that force is least justified against nonviolent misdemeants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public"). Similarly, the Fourth Circuit has held that a sexually invasive search is not to be conducted in a manner likely to instill

49

fear in the suspect.  United States v. Edwards, 666 F.3d 877, 885 (4th Cir. 2011).

In this case, Defendant May knew that Plaintiff Hyatt was unarmed, secured by multiple officers in the bathroom, not resisting, and not attempting to flee.  It would have been clear to a reasonable officer that he could not display a weapon in those circumstances.  Because Plaintiff Hyatt's right to be free from the display of a weapon in these circumstances was clearly established, as well as with the invasiveness of the search, Defendant May is not entitled to qualified immunity with respect to Plaintiff Hyatt's unreasonable sexually invasive search claim.

## B.    Plaintiff Hyatt's State Law Claims

Plaintiff Hyatt also brings a state law claim for "false imprisonment and false arrest" and a state law claim for "assault and battery" against Defendants Lambert, May, and Lewis in their individual capacities.  [Doc. 63: Third Am. Complaint at ¶¶ 42-56].[18]

### 1.    Defendant Lewis

---

[18] The Court did not submit specific issues to the jury regarding the merits of the Plaintiffs' state law claims, on the assumption that the factual interrogatories that were submitted to the jury were sufficient for the Court to conclude whether those state law claims had been proven.

The Court first addresses Plaintiff Hyatt's state law claims against Defendant Lewis, who left the Pickens/Hyatt traffic stop prior to the search warrant's issuance and execution. As previously discussed, the officers had probable cause to search the vehicle after the dog alerted to Brandon Pickens' vehicle. As such, the officers were justified in detaining Plaintiff Hyatt while they searched the vehicle. <u>See</u> N.C. Gen. Stat. § 15A-256 (explaining that "[a]n officer executing a warrant directing a search of . . . a vehicle . . . may detain any person present for such time as is reasonably necessary to execute the warrant."). Accordingly, Plaintiff Hyatt's claims for false arrest and false imprisonment against Defendant Lewis are without merit. <u>See</u> <u>McConnell v. Watauga Cty.</u>, No. 5:17-cv-195-MOC-DCK, 2019 WL 2344223, at *10 (W.D.N.C. May 31, 2019) (Cogburn, J.) (holding that if probable cause supports a seizure, it is an absolute bar to claim for false arrest or false imprisonment), <u>aff'd</u>, 790 F. App'x 543 (4th Cir. 2020).

Similarly, Plaintiff Hyatt's claims for assault and battery against Defendant Lewis are without merit because Defendant Lewis interacted with Plaintiff Hyatt only while he was lawfully detained during the vehicle search. Accordingly, the Court concludes that the evidence does not support Plaintiff Hyatt's claims for false arrest and false imprisonment, assault, or battery against Defendant Lewis, and such claims are therefore dismissed.

51

### 2. Defendant May

The Court turns next to Plaintiff Hyatt's state law claims against Defendant May.

### a. False Arrest and False Imprisonment Claims

"False imprisonment is the illegal restraint of the person of any one against his will." State v. Lunsford, 81 N.C. 528, 530 (1879). "Under North Carolina law, the elements of a false imprisonment claim are: (1) the illegal restraint of plaintiff by defendant; (2) by force or threat of force; and (3) against the plaintiff's will." Kling v. Harris Teeter Inc., 338 F.Supp.2d 667, 679 (W.D.N.C. 2002). "While actual force is not required, there must be an implied threat of force which compels a person to remain where he does not wish to remain or go where he does not wish to go." West v. King's Dep't Store, Inc., 321 N.C. 698, 702, 365 S.E.2d 621, 623–24 (1988). A threat of force suffices when it "induce[s] a reasonable apprehension of force." Id. at 702, 365 S.E.2d at 624 (citation omitted). "A false arrest is an arrest without legal authority and is one means of committing a false imprisonment." Marlowe v. Piner, 119 N.C. App. 125, 129, 458 S.E.2d 220, 223 (1995). An unlawful search can constitute a false arrest even if the suspect has not been formally arrested. See Cates v. Sandoval, No. 1:20-cv-200, 2020 WL 5665537, at *3 (M.D.N.C. Sept. 23, 2020).

52

Here, Defendant May had probable cause to detain Plaintiff Hyatt while searching Brandon Pickens' vehicle. Following the search of the vehicle, however, Defendant May continued to detain Plaintiff Hyatt and sought a search warrant for the search of his person based on information that Defendant May knew was false. Accordingly, Defendant May's continued detention and strip search of Plaintiff Hyatt was unlawful. Defendant May executed his unlawful search with an actual threat of unlawful force against Plaintiff Hyatt by displaying a weapon, and an implied threat of force against Plaintiff Hyatt through his display of authority. Because Defendant May unlawfully continued to detain Plaintiff Hyatt, conducted an unlawful search pursuant to an invalid warrant, and perpetrated the unlawful search through the threat of force, the Court concludes that Defendant May is liable on Plaintiff Hyatt's claims for false arrest and false imprisonment.

### b. Assault and Battery Claims

Under North Carolina law, "[a]n assault is an offer to show violence to another without striking him, and a battery is the carrying of the threat into effect by the infliction of a blow." Dickens v. Puryear, 302 N.C. 437, 444, 276 S.E.2d 325, 330 (1981). The Fourth Circuit has explained that false imprisonment under North Carolina law "generally includes an assault and battery, and always, at least, a technical assault." Cloaninger ex rel. Estate

53

of Cloaninger v. McDevitt, 555 F.3d 324, 335 (4th Cir. 2009) (citing Hoffman v. Clinic Hosp., Inc., 213 N.C. 669, 197 S.E. 161 (1938) (per curiam)); see also Fowler v. Valencourt, 334 N.C. 345, 348, 435 S.E.2d 530, 532 (1993) (explaining that "[a] technical assault is always committed with false imprisonment."). Therefore, when an officer arrests or searches an individual without a lawful purpose, the use of any force against that individual constitutes assault and battery. Johnson v. City of Fayetteville, 91 F. Supp. 3d 775, 816 (E.D.N.C. 2015).[19]

As discussed above, Defendant May committed a false imprisonment when he detained Plaintiff Hyatt pursuant to an unlawfully obtained warrant. Because Defendant May had no lawful purpose for detaining Plaintiff Hyatt, he at least committed a technical assault and battery on Plaintiff Hyatt. Accordingly, the Court concludes that Defendant May committed an assault and battery under North Carolina law.

### c. Public Official Immunity

---

[19] Notably, the North Carolina statute authorizing the use of force by law enforcement officers "proscribes the use of the force by a law enforcement officer if the officer either knows that the arrest is unauthorized or does not have a reasonable belief that the suspect has committed a criminal offense." Glenn-Robinson v. Acker, 140 N.C. App. 606, 625, 538 S.E.2d 601, 615 (2000) (citing N.C. Gen. Stat. § 15A–401(d)) (internal quotation marks omitted).

Defendant May asserts that he is entitled to public official immunity on Plaintiff Hyatt's state law claims. [Doc. 138-1: Defendants' Memo in Support of Proposed Judgment at 9]. The jury found that Defendant May's conduct was not performed within the course of his employment with the Buncombe County Sheriff's Office [Doc. 134: Second Verdict at 4 (Issue No. 12.B.)], but it was unable to reach a unanimous decision as to whether Defendant May was entitled to public official immunity [see id. (Issue. No. 12.A.)].

To overcome Defendant May's assertion of public official immunity, Plaintiff Hyatt must show that Defendant May acted maliciously, corruptly, or outside the scope of his official authority. Wilcox v. City of Asheville, 222 N.C. App. 285, 289, 730 S.E.2d 226, 230 (2012). For the reasons discussed above, the Court finds that Defendant May's conduct during the Hyatt traffic stop was outside the scope of his official authority as a Buncombe County Sheriff's Deputy. This finding is consistent with the jury's determinations regarding Defendant May's conduct and is supported by the evidence.

Because Defendant May was acting outside the scope of his official authority, he is not entitled to public official immunity on Plaintiff Hyatt's state law claims.

### d. Punitive Damages

Under North Carolina law, punitive damages are recoverable on false imprisonment claims when the tort features "aggravating or outrageous conduct." Mullins by Mullins v. Friend, 116 N.C. App. 676, 684, 449 S.E.2d 227, 232 (1994) (citation omitted). Likewise, "punitive damages are recoverable in assault and battery cases only when the assault and battery is accompanied by an element of aggravation like malice." Kuykendall v. Turner, 61 N.C. App. 638, 643, 301 S.E.2d 715, 719 (1983). "North Carolina courts will not imply or impute malice, but instead require a showing of actual or express malice, 'that is, a showing of a sense of personal ill will toward the plaintiff which activated or incited a defendant to commit the [tortious conduct].'" Id. (quoting Shugar v. Guill, 304 N.C. 332, 338–39, 283 S.E.2d 507, 511 (1981)).

Upon careful review of the evidence presented at trial, the Court finds that the evidence does not support a finding that Defendant May engaged in aggravating or outrageous conduct or acted with actual or express malice such that an award of punitive damages would be appropriate. The evidence presented at trial showed that Defendant May's family background regarding the use of controlled substances caused him to pursue his law enforcement duties with particular zeal. In this case, it gave way to unconstitutional

overzealousness. That, however, is not malice. Accordingly, Plaintiff Hyatt's claim for punitive damages is dismissed.

### 3. Defendant Lambert

The Court turns next to Plaintiff Hyatt's state law claims against Defendant Lambert. As discussed above, Defendant Lambert lawfully detained Plaintiff Hyatt while searching the vehicle. Defendant Lambert was not aware that the search warrant was being obtained based in part on statements that Defendant May knew to be false. Thus, any state law claim against Defendant Lambert would be limited to Plaintiff Hyatt's detention pursuant to the search warrant and the reasonableness of the strip search.

As noted above, Plaintiff Hyatt's detention pursuant to the search warrant was unlawful because Defendant May made material false statements in order to procure the warrant. The jury, however, found that Defendant Lambert was not aware of the falsity of these statements. [Doc. 134: Second Verdict Sheet at 2]. Further, the jury found that Defendant Lambert conducted the strip search in a reasonable manner, and that it was Defendant May, not Defendant Lambert, who displayed a weapon during the search. [Doc. 132: First Verdict Sheet at 4]. Based on these findings, the Court concludes that the evidence does not support Plaintiff Hyatt's claims

for false arrest/false imprisonment, assault, and battery against Defendant Lambert, and such claims are therefore dismissed.

### C. Plaintiff Barrett's Federal Law Claims

Plaintiff Barrett brings claims under § 1983 for unlawful seizure in violation of the Fourth Amendment against Defendants Lambert and Lewis in their individual capacities. [Doc. 63: Third Am. Complaint at ¶¶ 97-107]. Defendants Lambert and Lewis assert qualified immunity against Plaintiff Barrett's federal claims. [Doc. 138-1: Defendants' Memo in Support of Proposed Judgment at 24-25].

The jury found that Plaintiff Barrett did not consent to her continued detention by Defendants Lambert and Lewis after she obtained insurance, [Doc. 132: First Verdict Sheet at 5]. Without Plaintiff Barrett's consent, Defendants Lambert and Lewis needed reasonable suspicion to continue detaining Plaintiff Barrett while seeking consent to search the Apartment. See United States v. Palmer, 820 F.3d 640, 649-50 (4th Cir. 2016) ("[A]n officer cannot investigate a matter outside the scope of the initial stop unless he receives the motorist's consent or develops reasonable, articulable

suspicion of ongoing criminal activity.") (citation and internal quotation marks omitted).[20]

The Court has found that Defendants Lambert and Lewis had reasonable suspicion to continue detaining Plaintiff Barrett while they asked questions about the contents of the Apartment. While some of the information presented to the Defendants was susceptible to an innocent explanation, the totality of the circumstances gave the Defendants reasonable suspicion to prolong Plaintiff Barrett's detention to investigate her possible involvement in criminal activity. Moreover, the Defendants then diligently pursued a means of investigation that was likely to confirm or dispel their suspicions by seeking consent to search Plaintiff Barrett's apartment. See United States v. Sharpe, 470 U.S. 675, 686 (1985). Accordingly,

---

[20] The Defendants admit that Plaintiff Barrett obtained insurance at 3:59 p.m. [Doc. 108: Jt. Stip. at ¶ 40]. Nevertheless, Defendant Lewis argues that she could have continued to lawfully detain Plaintiff Barrett, apparently indefinitely, because Plaintiff Barrett needed to go to the Department of Motor Vehicles to fix her tag and could not, therefore, "demonstrate that she was entitled to operate her vehicle while it still bore a revoked license plate." [Doc. 138-1: Defendants' Memo. in Support of Proposed Judgment at 20]. That simply is not the law. For example, an officer who has initiated a traffic stop and issued a warning for a broken taillight cannot indefinitely continue that detention, even though a traffic violation will inevitably occur when the vehicle broken taillight returns to the road. Likewise, Defendant Lewis could not continue detaining Plaintiff Barrett indefinitely simply because she had not completely cured the issue with her vehicle's tag. United States v. Lyons, 486 F.3d 367, 371 (8th Cir. 2007) ("Once the officer decides to let a routine traffic offender depart with a ticket, a warning, or an all clear, the Fourth Amendment applies to limit any subsequent detention or search.").

59

Defendants Lambert and Lewis cannot be held liable on Plaintiff Barrett's federal law claims.[21]

### D. Plaintiff Barrett's State Law Claims

Plaintiff Barrett brings claims for false imprisonment and false arrest against Defendants Lambert and Lewis in their individual capacities. [Doc. 63: Third Am. Complaint at ¶¶ 85-91]. Because the Court has determined that Defendants Lambert and Lewis had reasonable suspicion to support the continued detention of Plaintiff Barrett, Defendants Lambert and Lewis cannot be held liable on Plaintiff Barrett's claims for false imprisonment and false arrest. See Rousselo v. Starling, 128 N.C. App. 439, 450, 495 S.E.2d 725, 732 (1998) (dismissing a false imprisonment claim because the officer had reasonable suspicion to detain the plaintiff).

---

[21] Even if Defendants Lambert and Lewis lacked reasonable suspicion to continue detaining Plaintiff Barrett after she obtained insurance, Defendants Lambert and Lewis would be entitled to qualified immunity on Plaintiff Barrett's federal claims. After Plaintiff Barrett obtained insurance, it was unclear whether Plaintiff Barrett had consented to remain at the stop and answer the officers' questions or whether Defendants Lambert and Lewis were still detaining Plaintiff Barrett. The Defendants never expressed that they were detaining Plaintiff Barrett and she never asked them if she was free to leave. Likewise, it was a close question whether the Defendants had reasonable suspicion to continue detaining Plaintiff Barrett to ask questions about the Apartment. Given the totality of those circumstances, the Court cannot say it would have appeared beyond debate to any reasonable officer that it was unlawful to continue the stop in order to investigate suspicions of illegal activity at Plaintiff Barrett's apartment.

60

### E. Plaintiffs Hyatt and Barrett's Official Capacity Claims

In addition to asserting claims against the Defendants in their individual capacities, Plaintiffs Hyatt and Barrett also bring state law claims against Defendants Lambert, May, and Lewis in their official capacities. [Doc. 63: Third Am. Complaint at ¶¶ 42-56, 85-96]. The Plaintiffs further bring an action on the Sheriff's bond against Defendant Sheriff Miller and Western Surety Company. [Id. at ¶¶ 115-18].

"A claim against a sheriff deputy in his official capacity is akin to a suit against the office of sheriff itself." Franklin v. Lincoln Cty. Sheriff, No. 5:21-CV-00028-MR, 2021 WL 1554334, at *3 (W.D.N.C. Apr. 20, 2021) (Reidinger C.J.) (citing Monell v. New York City Dep't. of Soc. Servs., 436 U.S. 658, 690 (1978)). Accordingly, the Plaintiffs' official capacity claims are brought against Defendant Miller as the Buncombe County Sheriff.

In North Carolina, "[i]t is well settled that pursuant to the doctrine of sovereign immunity, the State is immune from suit absent waiver of immunity" and that a "suit against a public official in his official capacity is a suit against the State." White v. Trew, 366 N.C. 360, 363, 736 S.E.2d 166, 168 (2013) (citation and internal quotation marks omitted). "Sheriffs and deputy sheriffs are considered public officials for purposes of sovereign immunity." Morgan v. Spivey, No. 5:16-cv-00365-FL, 2017 WL 4399539, at

*6 (E.D.N.C. Sept. 29, 2017). "However, a sheriff may waive governmental immunity in at least two ways, by the purchase of a bond, N.C. Gen. Stat. § 58-76-5, or by purchase of liability insurance, N.C. Gen. Stat. § 153A-435(a)." Id.

Having found no basis to impose liability on Defendants Lambert and Lewis in their individual capacities, the Plaintiffs' claims against these Defendants in their official capacities and against the Sheriff and Western Surety on the Sheriff's bond are dismissed.

With respect to Plaintiff Hyatt's claims against Defendant May, the Plaintiffs argue that Defendant May's actions were "in furtherance of the Sheriff Office's business." [Doc. 137: Plaintiffs' Trial Brief at 10]. The jury, however, found that Defendant May's conduct during the Hyatt traffic stop was performed outside the course of his employment with the Buncombe County Sheriff's Office. [Doc. 134: Second Verdict Sheet at 4]. Because the jury found that Defendant May was acting outside the course of his employment during the Hyatt traffic stop, Defendants Miller and Western Surety Company cannot be held liable for Defendant May's actions during that time. See Robinson v. McAlhaney, 214 N.C. 180, 183, 198 S.E. 647, 650 (1938). Accordingly, Plaintiff Hyatt's claims against Defendant May in

his official capacity and against the Sheriff and Western Surety on the Sheriff's bond are dismissed.

## O R D E R

**IT IS, THEREFORE, ORDERED** that Plaintiff Hyatt shall have and recover $50,000 from Defendant May on Plaintiff Hyatt's § 1983 claims for unreasonable search and seizure in violation of the Fourth Amendment and on Plaintiff Hyatt's state law claims for false imprisonment/false arrest, assault, and battery.

**IT IS FURTHER ORDERED** that Plaintiff Hyatt and Plaintiff Barrett's other claims are hereby **DISMISSED WITH PREJUDICE** in their entirety.

A Judgment consistent with this Memorandum of Decision and Order shall be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: August 3, 2022

Martin Reidinger
Chief United States District Judge

63