# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:19-cv-00250-MR-WCM

| | | |
|---|---|---|
| **MARCUS HYATT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **JEFF MAY, in his individual** | ) | **MEMORANDUM OF** |
| **capacity,** | ) | **DECISION AND ORDER** |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Defendant May's Post-Trial Motions [Doc. 145].

## I.    BACKGROUND

### A.    Facts

On January 20, 2018, officers from the Buncombe County Sheriff's Office ("BCSO"), acting on a tip, conducted a traffic stop of a car driven by Brandon Pickens in which the Plaintiff Marcus Hyatt was a passenger. Plaintiff Hyatt was detained for the next several hours while officers searched the car and its occupants for illegal narcotics.  After completing the search of the car, the officers procured a search warrant and conducted a strip search of Plaintiff Hyatt in a nearby convenience store bathroom.  Ultimately, Plaintiff

Hyatt was not found to be in possession of any controlled substances, and he was released without charges.

At the same time that Plaintiff Hyatt was being detained, his girlfriend, Plaintiff Ashley Barrett, was stopped by BCSO officers in a separate traffic stop on suspicion that she was attempting to dispose of controlled substances at the couple's apartment. Following a search of Plaintiff Barrett's vehicle and the couple's apartment, no controlled substances were found, and Plaintiff Barrett was also released without charges.

## B. The Lawsuit

The Plaintiffs brought this action pursuant to 42 U.S.C. § 1983 and North Carolina state law, challenging the officers' actions during the respective traffic stops and searches. Specifically, Plaintiff Hyatt asserted claims for false imprisonment, false arrest, and assault and battery under state law and for unlawful search and seizure in violation of the Fourth Amendment[1] under 42 U.S.C. § 1983 against BCSO deputies J.D. Lambert, Jeff May, and Katherine Lewis. Plaintiff Hyatt also asserted a claim for unreasonable sexually invasive search in violation of the Fourth Amendment

---

[1] The Fourth Amendment to the United States Constitution is enforceable against the states through the Due Process Clause of the Fourteenth Amendment. See Mapp v. Ohio, 367 U.S. 643, 655 (1961).

2

under § 1983 against Defendants Lambert and May. Plaintiff Barrett asserted claims for false imprisonment and false arrest under state law and for unlawful seizure in violation of the Fourth Amendment under §1983 against Defendants Lambert and Lewis. The Plaintiffs also asserted a claim for action under the bond against Defendant Miller and Defendant Western Surety Company.[2]

## C. The Trial

From March 17, 2021 to March 25, 2021, the Court held a jury trial in this matter. Following the conclusion of the evidence, on March 22nd, the Court delivered the first set of instructions to the jury and presented them with a verdict sheet ("the First Verdict Sheet") setting forth nine (9) issues.[3] The jury deliberated from approximately 4:17 p.m. to 7:50 p.m., when the jury advised the Court through a note (Note 4)[4] that they wished to recess

---

[2] Plaintiff Barrett also asserted state law claims for trespass to property and § 1983 claims for unlawful search, but these claims were dismissed on summary judgment. [Doc. 99]. The Plaintiffs' § 1983 claims against the Defendants in their official capacities were dismissed as well. [Id.].

[3] Depending on the jury's responses to these first nine issues, the Court intended to use a second verdict sheet and provide further instructions, addressing additional factual issues as well as issues of causation and compensatory damages. The Court contemplated the use of a third verdict sheet to address the issue of punitive damages, if necessary.

[4] In the first three jury notes, the jury requested copies of exhibits and transcripts, as well as a further explanation on certain points of law.

3

for the evening.  Deliberations continued the following day, March 23rd.  At 3:15 p.m. on March 23rd, the jury sent out a note (Note 5), advising that they had reached an impasse.  While the Court and counsel discussed how to respond, however, at 3:22 p.m., the jury sent out another note (Note 6), advising that they had decided to continue deliberations.  At 3:34 p.m., the jury advised that it had reached a verdict (Note 7).  Upon returning to the courtroom, the foreperson of the jury confirmed that they had reached a verdict and that the verdict was unanimous among the jurors.  The jury answered the issues on the First Verdict Sheet as follows:

1. Did Defendant Lambert see Brandon Pickens' vehicle change lanes without signaling and affect the operation of another vehicle?

   Answer:  YES

2. Did Defendant Lambert have reasonable suspicion to stop Brandon Pickens' vehicle?

   Answer:  YES

3. Did Defendant Lambert's canine alert to Brandon Pickens' vehicle?

   Answer:  YES

4. Did Defendant Lambert nonetheless actually believe that his canine alerted?

4

Answer:    No response[5]

5.       Did Defendant May smell crack cocaine on Plaintiff Hyatt?

Answer:  NO

6.       Did Defendant May find a substance in Brandon Pickens' vehicle that produced a positive field test result for cocaine?

Answer:  NO

7.       Was the strip search of Plaintiff Hyatt conducted without the display of a dangerous weapon?

As to Defendant Lambert:    YES

As to Defendant May:         NO

8.       Was the conduct of the strip search by Defendant Lambert and/or Defendant May reasonable under the Fourth Amendment?

As to Defendant Lambert:    YES

As to Defendant May:         NO

9.       Did Plaintiff Barrett consent to stay with or go with Defendant Lambert and Defendant Lewis after she had obtained insurance for her vehicle?

Answer:    NO

---

[5] Issue No. 4 was to be answered only in the event that the answer to Issue No. 3 was "no."  Because the jury answered Issue No. 3 in the affirmative, no answer to Issue No. 4 was necessary.

5

[Doc. 132: First Verdict Sheet]. Following the return of the First Verdict Sheet, neither side requested to poll the jury.

Based upon the jury's answers to these issues, the Court convened another charge conference and drafted another verdict sheet ("the Second Verdict Sheet"), setting forth eight (8) additional issues (Issue Nos. 10 through 17). On the following day, March 24th, the parties made their closing arguments to the jury on these additional issues, and the Court instructed the jury as to the law. The jury was sent out to deliberate at 10:11 a.m.

At 12:05 p.m., the jury sent out a note (Note 8), stating that one of its members, Juror #6, was having a panic attack. At 12:34 p.m., the jury sent out another note (Note 9), advising that Juror #6 had calmed down and was able to proceed.

At 5:34 p.m., the jury sent out another note (Note 10), advising that they had reached an impasse with respect to the issues on the Second Verdict Sheet. The Court proposed giving an Allen[6] charge to the jury and read the proposed language to counsel. Neither side objected to the

---

[6] "An Allen charge, based on the Supreme Court's decision in Allen v. United States, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896), is '[a]n instruction advising deadlocked jurors to have deference to each other's views, that they should listen, with a disposition to be convinced, to each other's argument.'" United States v. Burgos, 55 F.3d 933, 935-36 (4th Cir. 1995) (quoting in part United States v. Seeright, 978 F.2d 842, 845 n.* (4th Cir. 1992)).

6

language of the charge.  The Court provided the Allen charge to the jury, and they returned to the jury room to deliberate.  At 8:21 p.m., the jury advised the Court that they wished to go home for the evening (Note 11), and court was recessed for the day.

On March 25th, the jury resumed deliberations at 9:10 a.m.  The Court began jury selection in an unrelated criminal case.  During that jury selection, the jury from the present case sent out another note (Note 12), which advised that the jury had been unable to come to a unanimous verdict on the Second Verdict Sheet.  The Court completed jury selection in the criminal matter and reconvened the parties in the afternoon to discuss the jury's note.  After extensive discussion and consultation with their clients, the parties stipulated that the Court would ask the jury to return the Second Verdict Sheet with answers to any of the issues on which they could unanimously agree and that, as to any issues that the jury did not agree to unanimously the Court would serve as the finder of fact.

The jury was then called into the courtroom and advised to complete the Second Verdict Sheet with respect to any issues which they agreed to unanimously.  At 3:24 p.m., the jury returned with only a partially completed Second Verdict Sheet.  Following the pronouncement of the partial verdict, Defendant May's counsel requested to poll the jury.  Upon polling the jury, it

7

was determined that with respect to Issue Nos. 10 and 12.B., the jury unanimously answered as follows:

> 10.     Did Defendant Lambert have knowledge that Defendant May had not obtained a positive field test result or smelled crack cocaine on Plaintiff Hyatt before executing the search warrant?
>
>         Answer:     NO[7]
>
> 12.B.   Was [the strip search of Plaintiff Hyatt] by Defendant May performed within the course of his employment with the Buncombe County Sheriff's Office?
>
>         Answer:     NO

[Doc. 134: Second Verdict Sheet].

It was also determined, however, that the jury's verdicts with respect to at least one of the other two issues that had been answered, Issue Nos. 13.A. and 14, was not in fact unanimous among all the jurors. The jury again retired to the jury deliberation room to determine whether they had, in fact, reached a verdict as to all of the answered issues.

While the jury was out, defense counsel requested—for the first time— to poll the jury as to the issues set forth on the First Verdict Sheet. Noting

---

[7] Because the jury answered Issue No. 10 "no," they were not required to answer Issue No. 11, which asked the jury whether Defendant Lambert acted maliciously, corruptly, or outside the scope of his official authority (Issue No. 11.A.) or whether he acted within the course of his employment (Issue No. 11.B.). In light of the jury's response to Issue No. 10, the Court need not address the questions presented in Issue No. 11.

8

that the First Verdict Sheet had been returned three days prior, the Court denied counsel's request as untimely.

At 3:45 p.m., the jury returned to the courtroom to announce that they were deadlocked as to Issue No. 13.A. and Issue No. 14.

Ultimately, the jury was unable to reach a verdict and deadlocked as to the following issues on the Second Verdict Sheet:

12.A.    Was [the strip search of Plaintiff Hyatt] by Defendant May malicious, corrupt, or outside the scope of his official authority?

13.A.    Was [the strip search of Plaintiff Hyatt] by Defendant(s) a proximate cause of any injury to Plaintiff Hyatt?

13.B.    What amount of damages has Plaintiff Hyatt sustained as a result of the Defendants' conduct?

14.    Did Defendants Lambert and Lewis have reasonable suspicion to detain Plaintiff Barrett after she obtained insurance for her car?

15.A.    Was [the detention of Plaintiff Barrett] by Defendant Lambert malicious, corrupt, or outside the scope of his official authority?

15.B.    Was [the detention of Plaintiff Barrett] by Defendant Lambert performed within the course of his employment with the Buncombe County Sheriff's Office?

16.A.    Was [the detention of Plaintiff Barrett] by Defendant Lewis malicious, corrupt, or outside the scope of her official authority?

16.B.     Was [the detention of Plaintiff Barrett] by Defendant Lewis performed within the course of her employment with the Buncombe County Sheriff's Office?

17.A.     Was [the search of Plaintiff Barrett] by Defendants a proximate cause of any injury to Plaintiff Barrett?

17.B.     What amount of damages has Plaintiff Barrett sustained as a result of the Defendants' conduct?

[Id.].

The jury was discharged, and in accordance with the parties' stipulation, the Court subsequently entered an Order memorializing the jury's findings and setting forth findings of fact and conclusions of law with respect to the issues on which the jury had deadlocked.[8]  [Doc. 142].  In that Order, the Court dismissed Plaintiff Barrett's claims in their entirety.  With respect to Plaintiff Hyatt's claims, the Court specifically found as follows:

1.     There was a sufficient evidentiary basis for the jury's finding that Defendant May displayed a weapon during the search of Plaintiff Hyatt.

2.     The Defendants were at all times acting under color of state law with respect to their conduct toward Plaintiff Hyatt.

3.     The strip search of Plaintiff Hyatt by Defendant May was outside the scope of his official authority.

---

[8] The Court's findings were based on the stipulations of fact submitted by the parties, the jury's verdict as shown in their answers on the Verdict Sheets, the Court's notes from the trial, and a preliminary transcript.  Neither party ordered a final transcript prior to the court reporter's extended illness and untimely death.

10

4. Defendant May's wrongful conduct was a proximate cause of an injury to Plaintiff Hyatt.

5. Defendant May is liable to Plaintiff Hyatt for damages in the amount of $50,000.

[Doc. 142]. Additionally, the Court made the following conclusions of law with respect to Plaintiff Hyatt's claims:

1. Defendant Lambert had probable cause to stop Brandon Pickens' vehicle for violating N.C. Gen. Stat. § 20-154(a), which prohibits affecting the operation of another vehicle when changing lanes without signaling.

2. Because the initial traffic stop was supported by probable cause, Plaintiff Hyatt's claim for unreasonable seizure based on the initial traffic stop is dismissed.

3. The canine sniff of Pickens' vehicle was lawful because it occurred during the time reasonably required to issue the ticket for the traffic violation.

4. Because the dog alerted to Pickens' vehicle, the deputies had probable cause to search the vehicle, and the detention of Plaintiff Hyatt during this search was lawful.

5. Accordingly, Plaintiff Hyatt's § 1983 claims against Defendants Lambert, Lewis, and May based on the initial traffic stop and the search of the vehicle are dismissed.

6. Defendant May had Officer Hendricks include statements in the application for the search warrant that Defendant May knew to be false.

7. Considering all of the residual facts set forth in the search warrant together, the totality of the circumstances did not establish probable cause to conduct a strip search of Plaintiff Hyatt. As such, May's false statements regarding the odor of

cooked crack cocaine and the positive field test result for cocaine were necessary to the magistrate's probable cause determination.

8.  Defendant May committed a Fourth Amendment violation when he included materially false statements in the warrant application for the search.

9.  Defendant May's actions in detaining Plaintiff Hyatt and procuring a warrant based on materially false statements were a proximate cause of an injury to Plaintiff Hyatt.

10. Defendant May is not entitled to qualified immunity as to this claim.

11. As Defendant Lambert had no knowledge of Defendant May's false statements, Defendant Lambert is entitled to qualified immunity with respect to Plaintiff Hyatt's claims based on the detention and the search pursuant to the warrant.

12. Defendant May conducted the strip search in a way that violated Plaintiff Hyatt's constitutional right to be free from an unreasonable sexually invasive search.

13. Only Defendant May's actions in conducting an unreasonable sexually invasive search were a proximate cause of an injury to Plaintiff Hyatt; accordingly, the Plaintiff's claim against Defendant Lambert for an unreasonable sexually invasive search is dismissed.

14. Defendant May is not entitled to qualified immunity with respect to Plaintiff Hyatt's unreasonable sexually invasive search claim.

15. Because the officers had probable cause to search the vehicle after the dog alerted, the officers were justified in detaining Plaintiff Hyatt while they searched the vehicle. Accordingly, Plaintiff Hyatt's claims for false arrest and false imprisonment against Defendant Lewis are without merit.

16.    Plaintiff Hyatt's claims for assault and battery against Defendant Lewis are without merit because Defendant Lewis interacted with Plaintiff Hyatt only while he was lawfully detained during the vehicle search. Accordingly, the evidence does not support Plaintiff Hyatt's claims for false arrest and false imprisonment, assault, or battery against Defendant Lewis, and such claims are therefore dismissed.

17.    Defendant May had probable cause to detain Plaintiff Hyatt while searching Brandon Pickens' vehicle; however, Defendant May continued to detain Plaintiff Hyatt following the search of the vehicle and sought a search warrant for the search of his person based on information that Defendant May knew was false [namely, Defendant May asserted that he smelled cocaine on Hyatt and that he found a small quantity of some substance that he field tested for cocaine which test was asserted was positive, but that the jury found these assertions to be false]. Accordingly, Defendant May's continued detention and strip search of Plaintiff Hyatt was unlawful.

18.    Because Defendant May unlawfully continued to detain Plaintiff Hyatt, conducted an unlawful search pursuant to an invalid warrant, and perpetrated the unlawful search through the threat of unlawful force, Defendant May is liable on Plaintiff Hyatt's claims for false arrest and false imprisonment.

19.    Defendant May committed a false imprisonment when he detained Plaintiff Hyatt pursuant to an unlawfully obtained warrant.

20.    Because Defendant May had no lawful purpose for detaining Plaintiff Hyatt, Defendant May committed an assault and battery under North Carolina law.

21.    Defendant May's conduct during the Hyatt traffic stop was outside the scope of his official authority as a Buncombe County Sheriff's Deputy; accordingly, he is not entitled to public official immunity on Plaintiff Hyatt's state law claims.

22.    The evidence does not support a finding that Defendant May engaged in aggravating or outrageous conduct or acted with actual or express malice such that an award of punitive damages would be appropriate; accordingly, Plaintiff Hyatt's claim for punitive damages is dismissed.

23.    Defendant Lambert lawfully detained Plaintiff Hyatt while searching the vehicle and was not aware that the search warrant was being obtained based in part on statements that Defendant May knew to be false. Thus, any state law claim against Defendant Lambert is limited to Plaintiff Hyatt's detention pursuant to the search warrant and the reasonableness of the strip search.

24.    While Plaintiff Hyatt's detention pursuant to the search warrant was unlawful because Defendant May made material false statements in order to procure the warrant, Defendant Lambert was not aware of the falsity of these statements, and he conducted the strip search in a reasonable manner. Accordingly, the evidence does not support Plaintiff Hyatt's claims for false arrest/false imprisonment, assault, and battery against Defendant Lambert, and such claims are therefore dismissed.

25.    Having found no basis to impose liability on Defendants Lambert and Lewis in their individual capacities, the Plaintiffs' claims against these Defendants in their official capacities and against the Sheriff and Western Surety on the Sheriff's bond are dismissed.

26.    Because the jury found that Defendant May's conduct during the Hyatt traffic stop was performed outside the course of his employment with the Buncombe County Sheriff's Office, Defendants Miller and Western Surety Company cannot be held liable for Defendant May's actions during that time. Accordingly, Plaintiff Hyatt's claims against Defendant May in his official capacity and against the Sheriff and Western Surety on the Sheriff's bond are dismissed.

[Doc. 142].

Based on these Findings of Fact and Conclusions of Law, the Court entered Judgment in favor of Plaintiff Hyatt against Defendant May in the amount of $50,000 on Plaintiff Hyatt's § 1983 claims for unreasonable search and seizure and on Plaintiff Hyatt's state law claims for false imprisonment/false arrest, assault, and battery and dismissed the remainder of the Plaintiff's claims. [Docs. 142, 143]. Thereafter, Defendant May filed the present post-trial motions, seeking a new trial, the entry of a judgment as a matter of law, and/or amended findings of fact. [Doc. 145]. Plaintiff Hyatt filed a Response in opposition to these post-trial motions [Doc. 148], and Defendant May filed a Reply [Doc. 149].

Accordingly, the motion has been fully briefed, and this matter is ripe for disposition.

## II.     STANDARD OF REVIEW

### A.     Motion for New Trial

Under Rule 59 of the Federal Rules of Civil Procedure, the Court may set aside a verdict and grant a new trial if the Court is of the opinion that a verdict (1) "is against the clear weight of the evidence"; (2) "is based upon evidence which is false"; or (3) "will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." Atlas Food Sys. and Servs., Inc. v. Crane Nat'l Vendors, Inc.,

99 F.3d 587, 594 (4th Cir. 1996) (quoting <u>Aetna Cas. & Sur. Co. v. Yeatts</u>, 122 F.2d 350, 352-53 (4th Cir. 1941)); Fed. R. Civ. P. 59(a)(1) (stating that court may set aside jury verdict "for any reason for which a new trial has heretofore been granted in an action at law in federal court").

In reviewing a motion for new trial, the Court is permitted to weigh the evidence and consider the credibility of the witnesses. <u>Cline v. Wal-Mart Stores, Inc.</u>, 144 F.3d 294, 301 (4th Cir. 1998). The decision to grant or deny a new trial is a matter within the Court's sound discretion. <u>See</u> <u>id.</u>

### B. Motion for Judgment as a Matter of Law

"If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may ... grant a motion for judgment as a matter of law[.]" Fed. R. Civ. P. 50(a)(1)(B). "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal issues raised by the motion." Fed. R. Civ. P. 50(b). "No later than 28 days after the entry of judgment ..., the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." <u>Id.</u> "In ruling on the renewed motion, a court may: (1) allow judgment on the

16

verdict, if the jury returned a verdict; (2) order a new trial; of (3) direct the entry of judgment as a matter of law." Id.

When reviewing a Rule 50(b) motion, the Court must view all the evidence in the light most favorable to the prevailing party and draw all reasonable inferences in his favor. Wickersham v. Ford Motor Co., 997 F.3d 526, 534 (4th Cir. 2021); Konkel v. Bob Evans Farms Inc., 165 F.3d 275, 279 (4th Cir. 1999). "If, viewing the facts in the light most favorable to the non-moving party, there is sufficient evidence for a reasonable jury to have found in the non-moving party's favor, we are constrained to affirm the jury verdict." First Union Com. Corp. v. GATX Cap. Corp., 411 F.3d 551, 556 (4th Cir. 2005). A jury verdict will withstand a Rule 50(b) motion unless the non-moving party presented no substantial evidence to support the jury verdict. Stamathis v. Flying J, Inc., 389 F.3d 429, 436 (4th Cir. 2004). "In making this determination, [courts] are not permitted to retry factual findings or credibility determinations reached by the jury." Cline, 144 F.3d at 301. "Rather, [courts] are to assume that testimony in favor of the non-moving party is credible, 'unless totally incredible on its face,' and ignore the substantive weight of any evidence supporting the moving party." Id. (quoting Duke v. Uniroyal, Inc., 928 F.2d 1413, 1419 (4th Cir. 1991)).

## C.    Motion for Amended Findings and Amended Judgment

**"**On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings— and may amend the judgment accordingly.  The motion may accompany a motion for a new trial under Rule 59."  Fed. R. Civ. P. 52(b). "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous . . . ."  Fed. R. Civ. P. 52(a)(6).

"The primary purpose of Rule 52(b) is to ensure that the trial court's findings of fact and legal reasoning are clear . . . not to allow a party a second opportunity to prove its case."  Alcala v. Hernandez, No. 4:14-cv-04176-RBH, 2015 WL 7312891, at *1 (D.S.C. Nov. 19, 2015) (quoting Haberen v. Kaupp Vascular Surgeons, Ltd., 151 F.R.D. 49, 50–51 (E.D.Pa.1993)). "Parties cannot use a Rule 52(b) motion to relitigate an issue or to present evidence that could have been presented prior to the court's order."  Curtis v. Abell, No. GJH-14-566, 2014 WL 3741535, at *2 (D. Md. July 28, 2014). Rather, a Rule 52(b) motion is "intended to correct manifest errors of law or fact or to present newly discovered evidence."  Driskell v. Summit Contracting Grp., Inc., 325 F. Supp. 3d 665, 679 (W.D.N.C. 2018), aff'd, 828 F. App'x 858 (4th Cir. 2020).

## III.    DISCUSSION

### A.    Motion for New Trial

Defendant May first argues that he is entitled to a new trial on the grounds that the jury's findings regarding (1) the display of a dangerous weapon, (2) the absence of an odor of cooked crack cocaine on Plaintiff Hyatt's person, and (3) the lack of a positive field test for cocaine were all against the clear weight of the evidence and based on evidence that was false.  Alternatively, he contends that upholding the judgment would result in a miscarriage of justice.  [Doc. 145-1 at 2-11].

#### 1.    Dangerous Weapon

The jury unanimously found that Defendant May displayed a dangerous weapon during Plaintiff Hyatt's strip search.  In its subsequent Findings of Fact, the Court found that the display of this dangerous weapon reasonably caused Plaintiff Hyatt fear and anxiety.  Based upon these findings, the Court concluded that Defendant May's display of the dangerous weapon rendered the conduct of the search by Defendant May unreasonable[9] and that he was not entitled to qualified immunity.

---

[9] The jury also unanimously determined that the conduct of the search by Defendant May was not reasonable.  [Doc. 132: First Verdict Sheet, Issue No. 8].

In his direct examination, Plaintiff Hyatt was asked whether he saw the officers "holding anything" while he was searched. Plaintiff Hyatt testified, "I'm not sure. A taser or gun, I'm not sure. I don't know what it was."[10] While Plaintiff Hyatt was unable to identify the precise nature of the object (i.e., whether the object was a taser or gun), either would constitute a dangerous weapon, and thus Hyatt's testimony was sufficient to support the jury's finding that a dangerous weapon was displayed during his strip search.

Defendant May challenges the jury's assessment of Hyatt's credibility in testifying on this issue, citing a number of previous statements in which Hyatt did not mention the use or display of any dangerous weapon during the strip search. As the Defendant concedes, however, his counsel was able to fully explore these inconsistencies in his cross-examination of the Plaintiff. [See Doc. 145-1 at 4 (describing defense counsel's cross-examination of Plaintiff)]. The jury was therefore able to consider these prior statements in determining whether they found the Plaintiff to be credible.

---

[10] As noted previously, no formal trial transcript has been prepared. No party requested a transcript until the court reporter had, unfortunately, passed away. As such, the Court relies upon the preliminary transcript prepared by the court reporter at the Court's request prior to her death, as well as the Court's own extensive and detailed notes in recounting the Plaintiff's testimony.

As for the identity of the officer who displayed the dangerous weapon, it is undisputed that the only officers present during the strip search were Lambert and May. Both officers denied displaying any type of weapon during the search. After considering the evidence and assessing the credibility of the witnesses, the jury clearly believed the testimony of Defendant Lambert and discredited the testimony of Defendant May on this issue. In light of this credibility assessment, the jury's determination that Defendant May displayed a dangerous weapon during Plaintiff Hyatt's strip search was not against the clear weight of the evidence.

### 2. Odor of Cooked Crack Cocaine

Defendant May next argues that the jury's determination that he did not in fact smell crack cocaine on Plaintiff Hyatt is a finding that is against the clear weight of the evidence.

On this point, Plaintiff Hyatt denied that he smelled like crack cocaine. Defendant May, on the other hand, testified that he smelled the odor of cooked crack cocaine on Hyatt's person. He testified in detail how he came to learn the odor of certain drugs while working in housing projects, what the odor of cooked crack cocaine smelled like, and how the odor is different after cooking versus after smoking. No other officer who was on the scene corroborated Defendant May's testimony about this odor. Lambert, Lewis,

and Stockton all testified that they were not familiar with the smell of cooked crack cocaine, but none testified that the smelled anything out of the ordinary on Plaintiff Hyatt.[11]

This issue simply came down to a matter of whom the jury believed: Plaintiff Hyatt testified that he did not have the odor of crack cocaine about him, and Defendant May testified that he did. The Court carefully instructed the jury as to how to evaluate the credibility of the witnesses, including the multiple factors that go into such evaluation.[12] Ultimately, the jury found Plaintiff Hyatt to be more credible on this issue. The jury's determination in this regard is not against the clear weight of the evidence.

### 3. Positive Field Test

---

[11] The Defendant contends that "there can be no dispute an odor was actually there" because the canine alerted to the area in the vehicle where Hyatt had been sitting. [Doc. 145-1 at 10]. Whether a narcotics dog alerted to a vehicle, however, is not determinative of whether a person standing outside of the vehicle also had an odor of narcotics about him. The olfactory abilities of a human are not comparable to those of a canine.

[12] Among the things that the Court instructed the jury to consider in evaluating the credibility of the witnesses were: (1) whether the witness has any motive or reason to be truthful or untruthful; (2) his or her interest, if any, in the outcome of the case; (3) whether his or her attitude or conduct showed bias, prejudice or influence; (4) whether his or her testimony bears the earmarks of truthfulness; (5) to what extent, if any, the testimony is corroborated by other testimony which is not questioned, or by known or admitted facts; (6) the intelligence and mental capacity of the witness; and (7) his or her opportunity to have accurate knowledge of the matters to which he or she testified.

22

Defendant May testified that he conducted a field test on a substance that he found in Pickens' vehicle. He described this substance being the size of a piece of sea salt. May testified that he suspected that this substance was an illicit substance, and that the field test confirmed that it was crack cocaine. Deputy Stockton[13] also testified under oath that he personally observed Defendant May test the substance, and that he watched as the test returned a positive result. At the time this test was performed, Hyatt was seated in the rear passenger seat of Lambert's SUV behind a metal grill and was unable to observe any test being performed. Based on this evidence, Defendant May contends that the jury's finding that he did not find a substance in the vehicle that produced a positive field test result for cocaine is against the clear weight of the evidence.

Contrary to the Defendant's argument, however, there is significant evidence to support the jury's determination that Defendant May did not find a substance in the vehicle that tested positive for cocaine. The item allegedly discovered and tested was only the size of a piece of sea salt, an amount so small that the testing apparently destroyed the substance altogether. The officers otherwise did not find any illicit substances in Pickens' vehicle. The

---

[13] Deputy Stockton was named as a defendant in this action, but he was dismissed prior to the commencement of the trial.

testing of such a miniscule amount, along with the lack of any evidence of any significant amount of illicit substances, reasonably raises an inference that Defendant May was looking to manufacture probable cause in order to further detain and search the occupants of the vehicle and therefore was not truthful in seeking the search warrant of Plaintiff Hyatt.

Further, although Defendant May and several other officers were wearing body cameras, those cameras were only turned on intermittently; no body camera captured the discovery of any substances, what any such substance may have looked like, the retrieval of any field test kit, or any such test being conducted. The substance was not preserved as evidence, nor was the field test kit that Defendant May purportedly used. No photographs or videos were taken of the substance or the test kit, and the allegedly positive field test result was never shown to Plaintiff Hyatt. Under these circumstances, the jury reasonably concluded that Defendant May was not truthful in testifying that he discovered a substance in the vehicle that tested positive for cocaine.

In seeking a new trial, the Defendant argues that "huge holes in the evidence strongly suggest (if not prove) that the jury must have been biased or prejudiced or unduly influenced by something other than the evidence, as no reasonable jury could come to this jury's findings based upon the

evidence presented at trial." [Doc. 145-1 at 7]. Contrary to the Defendant's argument, there were not "huge holes" in the evidence presented; rather, so many of the factual disputes at issue in this case came down to a matter of "he said/he said." Hyatt asserted that a taser or a gun was pointed at him during the strip search; May denied that any weapon was displayed. May asserted that he could smell the odor of cooked crack cocaine on Hyatt's person; the other officers near Hyatt did not observe any such smell, and Hyatt denies that any such odor existed. May asserted that the sea-salt-sized substance found in Pickens' vehicle field tested positive for cocaine; Hyatt denied that any such test occurred. Based on the evidence, the jury was left to determine who was telling the truth. Ultimately, the jury determined that Plaintiff Hyatt's testimony was credible and that Defendant May's was not. The Court finds that the evidence supports the jury's credibility determinations. The Defendant's motion for a new trial on the grounds that the verdict was against the clear weight of the evidence or based on evidence that was false is therefore denied.

### 4. Miscarriage of Justice

Alternatively, Defendant May argues that he should receive a new trial because upholding the verdict would result in a miscarriage of justice. Specifically, the Defendant takes issue with the Court's denial of his belated

request to poll the jury as to their answers on the First Verdict Sheet. [Doc. 145-1 at 11-16].

Rule 48 of the Federal Rules of Civil Procedure provides, in pertinent part, that "[a]fter a verdict is returned but before a jury is discharged, the court must on a party's request . . . poll the jurors individually." Fed. R. Civ. P. 48(c). The right to a jury polling, however, is "not [a right] of constitutional dimension, and it can be waived if not invoked in a timely manner." Ira Green, Inc. v. Mil. Sales & Serv. Co., 775 F.3d 12, 25 (1st Cir. 2014).

In the present case, the jury returned a unanimous verdict on March 23, 2021, with respect to the issues on First Verdict Sheet. [Doc. 132]. When the jury returned this verdict, the foreperson confirmed that the verdict was unanimous among all eight jurors, and answers were provided as to all of the issues the jury was required to answer on the sheet. There was no indication that the jury's verdict in the First Verdict Sheet was anything other than unanimous, and Defendant May, despite having the right to do so, did not request to poll the jury. The jury's verdict as recorded on the First Verdict Sheet resolved a number of factual disputes, which then dictated the range of issues to be presented in the second phase of deliberation. Based on the jury's answers in the First Verdict Sheet, and after conducting another charge conference, the Court drafted a Second Verdict Sheet and jury instructions

addressing the remaining issues, primarily pertaining to causation and damages. Based on the framing of the issues on the Second Verdict Sheet, counsel then gave additional closing arguments. Thus, while the jury was not technically "discharged" at that point, they were effectively discharged with respect to those issues resolved in the First Verdict Sheet, and those issues became the basis for the second phase of instruction, arguments, and deliberation.

The Defendant could have requested to poll the jury after they announced their first verdict, but he failed to do so. Based upon this verdict, the Court then crafted a new verdict sheet with a new round of issues to be determined by the jury. The jury heard another round of closing arguments from counsel and further instructions from the Court on those issues and retired to deliberate. It was not until the jury had indicated that they had reached an impasse with respect to the issues on the Second Verdict Sheet—three days after the First Verdict Sheet had been returned—that counsel finally requested to poll the jury with respect to their first verdict. Under these highly unusual circumstances, the Court concludes that the Defendant's request to poll the jury regarding the First Verdict Sheet was

untimely and that he therefore waived his right to poll the jury regarding that verdict by failing to make a timely request to do so.[14]

In his motion, the Defendant further speculates as to unidentified "coercion" and various improper influences that may have compromised the jury's findings. [Doc. 145-1 at 14-16]. However, there is nothing in the record to support the Defendant's speculation in this regard. The only concrete example of "improper influence" that Defendant alludes to is one instance when Plaintiff Barrett (who is white) testified that the officers told her that she "had too many black people coming into my house." The Defendant argues that with this testimony the Plaintiffs "gratuitously invoked race in a case where it did not belong, at a time where racial tensions, both local and nationally, and especially towards white cops, was at a boiling point." [Doc. 145-1 at 14]. Barrett's singular statement, however, is not sufficient to impugn the entire verdict in this case. The Defendants promptly objected to and moved to strike Barrett's testimony in this regard, and that objection was sustained. The jury was subsequently instructed to consider only the

---

[14] Even if the Court erred in failing to poll the jury regarding their findings on the First Verdict Sheet at the Defendant's request, any such error would be harmless, as there is no indication that the jury failed to reach unanimity with respect to any of the issues on the First Verdict Sheet. In addition, any such error was invited by the Defendant acquiescing to the submission of the Second Verdict Sheet to the jury, and arguing to the jury regarding issues that were formulated based on the jury's answers on the First Verdict Sheet.

28

evidence that was allowed, and the Court presumes that the jury duly followed its instructions. For all of these reasons, the Defendant's argument that upholding the verdict would cause a miscarriage of justice is without merit.

The Supreme Court has long held that "a litigant is entitled to a fair trial but not a perfect one, for there are no perfect trials." McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 553 (1984) (citation and internal quotation marks omitted). The trial in this case was certainly far from perfect; the Court and the parties alike were thrown more procedural and logistical curveballs than in almost any other trial in this Court's memory. Despite these challenges, the Court endeavored to provide the parties a fair opportunity to try their case and bring it to conclusion. When it appeared that the jury would not be able to render a unanimous decision a few remaining issues, the parties were faced with a difficult decision: accept a mistrial and expend even more money and time trying the remaining portions of this case to another jury, or stipulate that this Court could finish the job of fact-finding that the jury could not. The parties chose the latter, and the Court has completed this task. Having carefully reviewed the unanimous findings made by the jury, in addition to the Court's own findings and conclusions, the

Court concludes that the verdict is supported by the evidence and would not result in a miscarriage of justice.

For all of these reasons, the Defendant's motion for a new trial is therefore denied.

## B. Motion for Judgment as a Matter of Law

In the alternative to a new trial, the Defendant moves the Court to enter a judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure[15]; or to make amended findings of fact under Rule 52(b) of the Federal Rules of Civil Procedure and then amend the judgment; or to alter or amend the judgment under Rule 59(e) of the Federal Rules of Civil Procedure to prevent manifest injustice. [Doc. 145-1 at 16-25]. First, the Defendant argues that insufficient evidence was presented to support a finding that Defendant May displayed a weapon, or, that if a weapon was displayed, such display was objectively unreasonable, or that the display

---

[15] The Plaintiff contends that the Defendant did not properly preserve his Rule 50(b) motion in his Rule 50(a) motion at trial. [Doc. 148 at 1-6]. While the Defendant's first Rule 50(a) motion, which was made at the close of the Plaintiffs' evidence, raised only the issue of the Plaintiffs' credibility, the Defendant's *second* Rule 50(a), made at the close of the Defendants' case-in-chief, was broader in scope and can be fairly be viewed as raising the issues asserted in the Defendant's post-judgment Rule 50(b) motion. Accordingly, the Court will proceed to consider the merits of the Defendant's Rule 50(b) motion.

caused Plaintiff Hyatt any injury. At the very least, the Defendant argues that he is entitled to qualified immunity for the manner in which the strip search was conducted. Second, the Defendant contends that there is an insufficient basis to conclude that Defendant May's false statements regarding the odor of crack cocaine and a positive field test caused Plaintiff Hyatt to be searched unreasonably.[16] The Defendant argues, alternatively, that he is entitled to qualified immunity on this issue. Finally, the Defendant argues that an inconsistency exists in the jury's finding that Defendant Lambert conducted the strip search reasonably while Defendant May did not. [Id.].

The Defendant raised all of these arguments in his initial round of post-trial briefing [Doc. 138, 140, 141], and the Court addressed each of these

---

[16] With respect to this argument, the Defendant contends that it was error for the Court not to present factual interrogatories to the jury regarding whether Defendant May subjectively believed that the odor on Plaintiff Hyatt was, in fact, crack cocaine or whether he found a substance that tested positive for cocaine. Without these factual findings, Defendant May contends, the Plaintiff is missing an essential element of his Franks claim, namely, that the false statements had to have been made knowingly or with reckless disregard. The jury was not instructed as to these issues because the evidence did not support such instructions. The Defendant adamantly testified, without qualification, that the odor he smelled was crack cocaine. He provided an extensive explanation for the basis of his knowledge. He further testified, without equivocation, that he discovered a substance in the vehicle and that this substance tested positive for cocaine. Based on the question presented, the jury could have determined that no substance was actually found; or if found, the substance was not tested; or if found and tested, did not test positive for cocaine. Any of these scenarios would have resulted in an answer to this issue in favor of the Plaintiff. As to both of these issues, May's subjective beliefs would have only been relevant if there had been an argument that Defendant May was *mistaken* regarding the odor or discovering the substance that subsequently tested positive; that, however, was never the position of the Defendant.

31

arguments in its Order setting forth its findings of fact and conclusions of law. [Doc. 142]. The Court finds no reason to reconsider its findings or conclusions with respect to these issues. The Court will not reiterate its analysis on these issues, but instead incorporates that analysis here by reference. For the reasons previously stated, the Court denies the Defendant's requests for various forms of alternative relief.

**IT IS, THEREFORE, ORDERED** that Defendant May's Post-Trial Motions [Doc. 145] are **DENIED**.

**IT IS SO ORDERED.**

Signed: March 29, 2023

Martin Reidinger
Chief United States District Judge

32